Present:  Hassell, C.J., Koontz, Kinser, Goodwyn, and Millette,
          JJ., and Carrico and Russell, S.JJ.

ELIZABETH POLLARD NOAKES
                                        OPINION BY
v.  Record No. 091911          JUSTICE CYNTHIA D. KINSER
                                    September 16, 2010
COMMONWEALTH OF VIRGINIA

            FROM THE COURT OF APPEALS OF VIRGINIA

     In this appeal, a defendant challenges the sufficiency of

the evidence to support her conviction for involuntary

manslaughter, specifically contesting the findings that she was

criminally negligent and that her acts were a proximate cause of

a toddler's death.  Because there is sufficient evidence to

support both findings, we will affirm the judgment of

conviction.

                 MATERIAL FACTS AND PROCEEDINGS

     The relevant facts are undisputed.  The defendant,

Elizabeth Pollard Noakes, provided child care services in her

home, and on the day in question, October 18, 2006, had in her

care Noah Alexander Colassaco, a fifteen-month-old child, and

two other children.[1]  Noakes had been caring for Noah for

approximately three weeks and, throughout that time, had

---

[1] Code § 63.2-100 defines the term "[f]amily day home" as a
"child day program offered in the residence of the provider
. . . in care for one through 12 children under the age of 13
. . . when at least one child receives care for compensation"
and requires licensure or voluntarily registration for such
homes caring "for more than four children under the age of two."

experienced difficulty in getting Noah to lie down and sleep during "nap time."  Instead, he usually would stand in the crib and cry.  Noakes had tried "traditional means" to help Noah sleep, which included "rocking him to sleep" and "patting his back," without success.

Around noon on the day in question, Noakes put Noah and another toddler she was caring for in their cribs for an afternoon nap.[2]  The cribs were located in an upstairs, "loft" bedroom that was partially visible from Noakes' bedroom.  Only a half wall divided the two rooms, which were connected by a stairway.  The cribs, however, were not visible from Noakes' bedroom.  Noah's crib, as viewed from the loft's entrance, was positioned lengthwise against the back wall of the room, in the far right corner.  The rectangular crib was abutted on the right by one wall, on the rear with another, and on the left by another crib, with only the front, lengthwise portion unobstructed.  A third crib, in which Noakes placed the other toddler that day, was positioned a few feet from Noah's crib, nearer the entrance of the loft and also on the right wall.

---

[2] Noah's crib was of the "pack-n-play" style, made of nylon and mesh, with plastic on the four corners and its bottom only a short distance off the floor.  Noakes described it as a "portacrib."  Its design makes the crib flexible, portable, and suitable for use as a playpen and crib.

When Noakes left the loft, Noah was standing "facing the front of the crib" and crying.

At approximately 12:30 p.m., Noakes returned to the loft to "check on" Noah, who was still standing in the crib and crying. Knowing that when Noah stood in his crib, his chin was above the crib's sides, and also that Noah would fall asleep if he were lying or sitting in the crib instead of standing, Noakes decided to place a make-shift covering over the crib to prevent Noah from standing. After removing Noah from his crib, Noakes placed a thirty-three and one-quarter pound, collapsed "dog crate," which ran the length of the crib but was substantially narrower, on top of the crib. Noakes reasoned that the crate's weight would prevent Noah from standing up in the crib.

Noakes tested the stability of her contraption by shaking the crib with the crate on top to determine if the crate could fall into the crib and injure Noah. Satisfied that the crate could not fall into the crib, Noakes removed the crate, put Noah back into the crib, and placed a fabric-covered piece of approximately one-inch thick cardboard on top of the crib. The cardboard was added, in part, to cushion the force of any impact between Noah's head and the crate if Noah attempted to stand. Although the cardboard would cover the entirety of the crib's top, Noakes positioned it so the cardboard extended out over the front of the crib, where Noah often stood, thus leaving a small

3

"gap" in the rear between the crib's side and the cardboard. Noakes then placed the dog crate on top of the cardboard, towards the front side of the crib, where it covered a little more than one-half of the crib's width. Noakes examined the covering to ensure that Noah would not be able to reach into the dog crate and injure his fingers.

With Noah in his now-covered crib, Noakes remained in the loft for a short while to determine if the enclosure was causing any distress to Noah and if he was attempting to stand up in the crib despite the covering. Observing no problems, Noakes left the loft. Sometime before 1:00 p.m., Noakes, however, heard a noise from the loft and returned to find Noah sitting in his crib but not sleeping, with his face pressed against crib's front, mesh side. Concluding that Noah would not fall asleep if he were able to look for her, Noakes placed a toy in front of the crib to obstruct Noah's view "so that he would not be looking for [Noakes] but . . . would just get bored and go . . . to sleep."

Noakes again left the loft at about 1:00 p.m. and did not return until 3:15 p.m., when she came to wake the other toddler from his nap. Noakes testified, however, that she monitored the toddlers audibly from her bedroom during that time and heard no noise from either of them. Noakes testified that when she returned to wake the other child, she did not look at Noah's

crib, which was several feet to the left of the other crib, but "within [her] peripheral vision of the room."  She believed, however, that Noah was asleep since she did not hear any sounds from him when she awakened the other toddler.

Shortly after 4:00 p.m., Noakes returned to the loft to wake Noah and found him unconscious.  He was standing with his chin resting on the side of the crib, one or both of his hands gripping the crib's side, and his head and neck wedged between the cardboard and the crib.  His lips were blue and his skin was cold to Noakes' touch.  Noakes surmised that Noah had attempted to stand, had pushed up against the cardboard causing the dog crate to slide a few inches thereby creating a space between the covering on top of the crib and the crib's wall.  Noah then had moved his head toward the crib's center, where he normally stood, trapping himself in a space between the side of the crib and the cardboard, which was held in place by the weight of the dog crate.  Despite Noakes' efforts to revive Noah and the intervention of emergency medical personnel, Noah was pronounced dead at Noakes' home.

An autopsy of Noah's body revealed that the cause of death was "[a]sphyxia due to mechanical compression of neck."  The medical examiner who performed the autopsy found "a pressure mark at the neck [and] little broken blood vessels on the face," with "reddish coloring above and below the pressure mark."

5

According to the medical examiner, her findings were consistent with Noakes' explanation regarding the events leading to Noah's death.[3] The examiner also testified that a restriction of the oxygen supply to the brain, such as would be caused by the circumstances Noakes described, would cause unconsciousness "within a minute" and death within "minutes and not hours."

Noakes was subsequently convicted in a bench trial in the Circuit Court of the County of Chesterfield of involuntary manslaughter, in violation of Code § 18.2-36. The trial court found Noakes' conduct to be "arrogantly reckless, merciless and inhumane," and concluded that she had "recklessly disregard[ed] Noah's safety [and the] consequences of her actions, being indifferent as to whether the harm would result." The trial court sentenced Noakes to five years of incarceration, with four years suspended on the condition that she "be of good behavior upon [her] release from confinement" for a period of twenty years.

On appeal to the Court of Appeals of Virginia, a divided panel affirmed the trial court's judgment. Noakes v. Commonwealth, Record No. 0295-08-2 (Jan. 13, 2009) (unpublished). Upon rehearing en banc, the Court of Appeals

---

[3] Noakes cooperated with the police during all phases of their investigation, providing a written statement, answering questions for an audio recording, and demonstrating in a video recording her acts on October 18, 2006.

6

found that the "trial court could reasonably have concluded that [Noakes] recklessly disregarded Noah's safety by proceeding with her plan to prevent Noah from standing up by placing the dog crate on his crib." Noakes v. Commonwealth, 54 Va. App. 577, 589-90, 681 S.E.2d 48, 54 (2009). The Court of Appeals concluded that Noakes "could have foreseen the harm that could and did befall Noah from putting a thirty-three-pound collapsed dog crate on top of his crib." Id. at 590, 681 S.E.2d at 54. Accordingly, having found "sufficient[,] credible evidence to support a rational factfinder's decision that [Noakes] was criminally negligent and, therefore, was guilty of involuntary manslaughter beyond a reasonable doubt," the Court of Appeals affirmed the conviction. Id. at 593-94, 681 S.E.2d at 56.

Noakes now appeals to this Court. In a single assignment of error, she asserts the evidence was insufficient as a matter of law to sustain her conviction, claiming that "her acts did not rise to the level of criminal negligence nor could she have anticipated the unforeseeable acts that would be performed by the child while inside the crib."

ANALYSIS

When the sufficiency of the evidence is challenged on appeal, we review "the evidence in the light most favorable to the Commonwealth, the prevailing party in the [trial] court" and "accord the Commonwealth the benefit of all reasonable

7

inferences deducible from the evidence." Brown v. Commonwealth, 278 Va. 523, 527, 685 S.E.2d 43, 45 (2009); accord Jay v. Commonwealth, 275 Va. 510, 524, 659 S.E.2d 311, 319 (2008); Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003). We give the trial court's judgment sitting as the factfinder "the same weight as a jury verdict," Brown, 278 Va. at 527, 685 S.E.2d at 45, and we will affirm that judgment unless it "is plainly wrong or without evidence to support it." Code § 8.01-680; accord Dowden v. Commonwealth, 260 Va. 459, 467, 536 S.E.2d 437, 441 (2000).

We have defined the common law crime of involuntary manslaughter as "the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act." Mundy v. Commonwealth, 144 Va. 609, 615, 131 S.E. 242, 244 (1926); accord Brown, 278 Va. at 528, 685 S.E.2d at 45-46; Dowden, 260 Va. at 470, 536 S.E.2d at 443. To convict a person for involuntary manslaughter caused by the improper performance of a lawful act, the Commonwealth must show that the improper performance of the lawful act "amount[ed] to an unlawful performance of such lawful act, not merely a negligent performance; that is, the lawful act must have been done in a way so grossly negligent and culpable as to indicate an indifference to consequences or an absence of decent regard for

8

human life." Kirk v. Commonwealth, 186 Va. 839, 847, 44 S.E.2d 409, 413 (1947); accord Brown, 278 Va. at 528, 685 S.E.2d at 45-46; West v. Director, Dep't of Corrs., 273 Va. 56, 64, 639 S.E.2d 190, 195 (2007); Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992). "The accidental killing must be the proximate result of a lawful act performed in a manner 'so gross, wanton, and culpable as to show a reckless disregard of human life,'" Gooden v. Commonwealth, 226 Va. 565, 571, 311 S.E.2d 780, 784 (1984) (quoting King v. Commonwealth, 217 Va. 601, 607, 231 S.E.2d 312, 316 (1977)); the conduct must "manifest[] criminal negligence." West, 273 Va. at 64, 639 S.E.2d at 195; accord Cable, 243 Va. at 240, 415 S.E.2d at 220.

"In this context, the term[s] 'gross, wanton, and culpable' describe[] conduct. The word 'gross' means 'aggravated or increased negligence' while the word 'culpable' means 'deserving of blame or censure.'" Cable, 243 Va. at 240, 415 S.E.2d at 220 (quoting Bell v. Commonwealth, 170 Va. 597, 611, 195 S.E. 675, 681 (1938)). Gross negligence amounts to criminal negligence "when acts of a wanton or willful character, committed or omitted, show 'a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his [or her] acts.'"

9

Brown, 278 Va. at 528-29, 685 S.E.2d at 46 (quoting Riley v. Commonwealth, 277 Va. 467, 484, 675 S.E.2d 168, 177 (2009)); accord Morris v. Commonwealth, 272 Va. 732, 739, 636 S.E.2d 436, 440 (2006); Gallimore v. Commonwealth, 246 Va. 441, 445-46, 436 S.E.2d 421, 424 (1993); Cable, 243 Va. at 240, 415 S.E.2d at 220. While the improper performance of a lawful act must be "'so gross and culpable as to indicate a callous disregard of human life,'" it need "'not be so gross as to raise the presumption of malice.'" Beck v. Commonwealth, 216 Va. 1, 4, 216 S.E.2d 8, 10 (1975) (quoting Goodman v. Commonwealth, 153 Va. 943, 946, 952, 151 S.E. 168, 169, 171 (1930)) (internal quotation marks omitted). The Commonwealth must also prove that the criminally negligent act proximately caused the accidental death. Brown, 278 Va. at 529, 685 S.E.2d at 46; Gallimore, 246 Va. at 446, 436 S.E.2d at 424.

In determining whether conduct rises to the level of criminal negligence, an "objective standard" applies, and criminal negligence may be found to exist when the defendant "either knew or should have known the probable results of his[/her] acts." Riley, 277 Va. at 483-84, 675 S.E.2d at 177 (internal quotation marks omitted); Brown, 278 Va. at 528, 685 S.E.2d at 46; Jones v. Commonwealth, 272 Va. 692, 701, 636 S.E.2d 403, 408 (2006). Thus, the Commonwealth did not need to prove that Noakes actually knew or intended that her conduct

10

would cause, or would likely cause, Noah's death, but rather that Noakes should have known her acts created a substantial risk of harm to Noah.  See Jones, 272 Va. at 701-02, 636 S.E.2d at 408 (approving a trial court's finding of criminal negligence "[u]nder an objective standard" because the defendant-mother "knew or should have known that placing fourteen capsules of heroin and a plate with cocaine residue in the same room as her unattended eight-year-old son created a substantial risk of serious injury" as did "her continuous and illegal drug activity at the apartment when her young child was present" in view of the "dangers inherent in the illicit drug trade").

Citing Gallimore v. Commonwealth, 15 Va. App. 288, 296, 422 S.E.2d 613, 618 (1992), aff'd, 246 Va. 441, 448, 436 S.E.2d 421, 426 (1993), Noakes concedes on brief "that it is not necessary for a defendant to foresee the specific ma[nn]er in which injury occurred."  Noakes, nevertheless, argues that in evaluating the foreseeability of death or serious injury to Noah, attention must be given to the measures she "took to insure that death or serious injury would not occur."  Noakes points to her purpose for covering the crib — "to assist the child in sleeping" — and the "painstaking lengths [taken by her] to anticipate possible dangers and prevent them," as well her "regular[]" returns "to the adjoining bedroom so that she could monitor the child as she did housework."  Noakes claims, "[e]ach of these measures

11

reduced the probability of harm to the child to the point that no reasonably intelligent person, using an objective standard, could be charged with the knowledge . . . that the child probably would be harmed by the object."  In summary, Noakes claims that "[i]t was her inability to predict any and all possible dangers that failed her."

Upon review of the evidence, we conclude that Noakes' conduct in placing cardboard and a thirty-three and one-quarter pound, collapsed dog crate atop Noah's crib and failing to visually check on him for about three hours was wanton and willful, "showing a reckless or indifferent disregard of [Noah's rights], under circumstances [that made] it not improbable that injury [would] be occasioned, and [Noakes] is charged with the knowledge of[] the probable result of [her] acts."  Cable, 243 Va. at 240, 415 S.E.2d at 220.  Noakes knew that Noah would attempt to stand in his crib and also that when doing so, Noah's head and chin rose above the height of the crib's sides.  While she obviously took steps to prevent the crate's falling upon Noah and his reaching into the crate, Noakes should have known that a toddler, used to standing but constrained against his will, might attempt to free himself, thereby dislodging the makeshift covering and sustaining serious injury.  The measures that Noakes undertook to prevent the crate from falling upon Noah demonstrate her actual knowledge of the inherent danger of

the contraption she placed atop the crib. And, because Noakes knew that she had placed Noah in an inherently dangerous situation that could cause serious injury, she certainly should not have left Noah unattended for approximately three hours.[4]

In sum, we agree with the Court of Appeals' conclusion:

> [T]he act of attempting to limit Noah's ability to stand in his crib was not inherently unlawful; however, a rational factfinder could indeed determine that the placing of a thirty-three-pound dog crate on Noah's crib, combined with [Noakes'] inattentiveness in the face of this experimental and dangerous set-up and with Noah's conceded determination to stand up in his crib, constituted reckless and unlawful conduct in utter disregard of Noah's safety.

Noakes, 54 Va. App. at 593, 681 S.E.2d at 56.

Noakes, however, further contends that Noah's lifting "an object that weighed 30% greater than his own body weight and, without displacing [the object,] maneuver[ing] his head underneath it and asphyxiat[ing] himself" was not foreseeable and, thus, any knowledge of that danger cannot be "fairly imputed to her." Noakes maintains that if Noah had "not performed this improbable feat," her actions would not have caused injury to Noah. According to Noakes, Noah's actions were

---

[4] We also do not find Noakes' reliance on Forbes v. Commonwealth, 27 Va. App. 304, 498 S.E.2d 457 (1998) availing. The defendant in Forbes had "followed the medical directions he had been given" to address the risk that materialized, causing the accidental death; here, Noakes did not have the benefit of professional advice nor did her precautionary measures address the relevant risk. Id. at 312, 498 S.E.2d at 460.

therefore an intervening cause that rendered Noakes' conduct a remote, rather than a proximate, cause of Noah's death. We do not agree.

"A proximate cause is 'an act or omission that, in natural and continuous sequence unbroken by a superseding cause, produces a particular event and without which that event would not have occurred.' " Brown, 278 Va. at 529, 685 S.E.2d at 46 (quoting Williams v. Joynes, 278 Va. 57, 62, 677 S.E.2d 261, 264 (2009)). An intervening act, to "'break[] the chain of causal connection between an original act of negligence and subsequent injury,' " cannot have been "'reasonably foreseeable.' " Gallimore, 246 Va. at 447, 436 S.E.2d at 425 (quoting Delawder v. Commonwealth, 214 Va. 55, 58, 196 S.E.2d 913, 915 (1973)); accord Brown, 278 Va. at 529, 685 S.E.2d at 46. "Furthermore, an intervening event, even if a cause of the harm, does not operate to exempt a defendant from liability if the intervening event was put into operation by the defendant's negligent acts." Gallimore, 246 Va. at 447, 436 S.E.2d at 425 (citing Baxley v. Fischer, 204 Va. 792, 798, 134 S.E.2d 291, 295 (1964)).

Like the Court of Appeals, we conclude that whatever Noah did to maneuver his head and neck between the cardboard and the side of the crib was "put into operation" by Noakes' placing the covering atop the crib. Gallimore, 246 Va. at 447, 436 S.E.2d at 425. There is no evidence in this record to show an

14

unforeseeable, intervening act that broke the causal chain of connection between Noakes' original act of criminal negligence and Noah's subsequent death.  See id.  In other words, Noah would not have suffocated on the day in question if Noakes either had not placed the cardboard and dog crate atop Noah's crib while he was in the crib or, having erected the covering, had continuously monitored Noah during his nap.

## CONCLUSION

For these reasons, we will affirm the judgment of the Court of Appeals.

Affirmed.

15