## CIRCUIT COURT OF AUGUSTA COUNTY

James Paul Desper

 v.

John Woodson,
Warden

March 13, 2014

Case No. CL13001874-00

By Judge Victor V. Ludwig

This matter is before the Court on the Petition for *Habeas Corpus* filed by James Paul Desper, the focus of which was limited to assertions of ineffective counsel, and on the Commonwealth's Motion to Dismiss.

### I. *Procedure and Facts*

On March 8, 2010, Desper pleaded not guilty to four felonies, specifically, a violation of Va. Code Ann. § 18.2-67.1 and three violations of § 18.2-61, and, at a bench trial, the Court found him guilty of all charges. By order entered on September 1, 2010, the Court sentenced him to twenty years on each of four charges, to run consecutively, and suspended sixty years for the balance of Desper's life. Only three charges are at issue in this proceeding. The trial court's finding of guilt on the fourth charge was reversed by the Court of Appeals and, therefore, is not relevant this proceeding. I note that procedural fact only further to note that, because of the reversal, the Court entered an amended sentencing order on November 6, 2012, to address only the three convictions which were affirmed. Desper timely appealed his convictions, and, by order of May 15, 2012, the Virginia Supreme Court

denied his petition, and then, on September 24, 2012, denied his petition for a rehearing.

On appeal, Desper raised the issue of "the complaining witness' mental incapacity and [Desper's] knowledge thereof." *Desper v. Commonwealth*, 2011 Va. App. LEXIS 343, p. 1. Both the trial court, in its comments quoted hereafter, and the Court of Appeals, found the evidence sufficient to prove Desper's knowledge of the victim's incapacity. *Id.* at 2. In doing so, the Court of Appeals specifically noted that it was the Commonwealth's obligation to prove that the victim's condition is one "about which the accused knew or should have known." *Id.* at 9 (citing Va. Code Ann. § 18.2-67.10 (" 'Mental incapacity' means that condition of the complaining witness existing at the time of an offense under this article which prevents the complaining witness from understanding the nature or consequences of the sexual act involved in such offense and about which the accused knew or should have known.")). The Court's observation regarding the second prong of the definition was:

> Assuming without deciding that limitations on a defendant's own mental capacity short of insanity may serve to negate a finding that he knew or should have known of the complaining witness' mental incapacity, the only reasonable inference flowing from the evidence presented at trial, viewed in the light most favorable to the Commonwealth, is that appellant had sufficient mental *capacity* himself that he knew or should have known S.D. suffered from a mental *incapacity.* . . .

*Desper* at p. 15 (emphasis in original). As the Commonwealth correctly observed in its Motion, the Court of Appeals did not address the issue of whether diminished mental capacity, short of insanity, is a defense to the charges of which Desper was convicted because it did not need to do so. Desper did not make that legal argument on appeal; rather, in framing the issue on appeal, Desper assumed that the defense of diminished capacity was a valid one, and he merely argued that the evidence at trial was insufficient for the trial court to have made the finding of fact that Desper did or should have known of the victim's mental incapacity.

Desper grounds his Petition on the argument that counsel were ineffective because they "missed extraordinary evidence showing that [Desper] . . . was mentally retarded and that he had overlaying mental health issues affecting his ability to perceive as an average intelligent person should," Petition, p. 16, ¶ 25, "because the only critical element of the statutory rape charges was whether [Desper] knew or should have known that [the victim] was mentally incapacitated to consent to sexual intercourse." *Id.* at p. 17, ¶ 28.

Without attempting to summarize all of the evidence offered in the underlying case, suffice it to say that, taken in the light most favorable to the Commonwealth (and untainted by any of Desper's claims), there was

clearly evidence sufficient for the Court to find Desper guilty of the crimes with which he was charged (those which survived appellate review), an observation to which weight is added by the results of Desper's appeals.

After careful review of the pleadings and of the record of the underlying criminal case, the Court concludes that the Petition is without merit and that no plenary hearing is required. Accordingly, the Commonwealth's Motion is granted, and the Petition is dismissed.

A. *Standard of Review*

Desper's claims of ineffective counsel are governed by the holding in *Strickland v. Washington*, 466 U.S. 668 (1984). A *habeas* petitioner claiming ineffective assistance of counsel must establish both that his attorney's conduct was deficient and that the petitioner was actually prejudiced by his attorney's representation. "Unless [the petitioner] establishes both prongs of the two-part test, his claims of ineffective assistance of counsel must fail." *Jerman v. Director of the Dept. of Corrections*, 267 Va. 432, 438 (2004); *see also Bell v. Cone*, 535 U.S. 685, 695 (2002).

To establish deficient performance, the test is stringent indeed. It requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, at 687. Counsel's representation must fall below an objective standard, "the proper measure of [which] remains simply reasonableness under prevailing professional norms." *Id.* at 688. "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between the defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

Having concluded that the standard is objective and having articulated the proper measure for determining defense counsel's conduct, the Court in *Strickland* offered guidance in how to apply those principles. In assessing the quality of defense counsel's representation, "judicial scrutiny of counsel's performance must be highly deferential" when an attorney's performance has been attacked as constitutionally ineffective. *Strickland*, 466 U.S. at 689. The Court then offered the following cautions when gauging counsel's trial performance to determine if it was ineffective:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

> professional assistance; that is, the defendant must overcome
> the presumption that, under the circumstances, the challenged
> action "might be considered sound trial strategy."

*Id.* (citation omitted).

In addition to establishing the ineffectiveness of counsel, a *habeas* petitioner must also affirmatively prove that he was actually prejudiced as a result of counsel's conduct. Actual prejudice is shown by evidence "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Finally, while the petitioner must prove both prongs of *Strickland* in order to prevail, it is not necessary in every instance for the Court to examine or determine the sufficiency of the evidence on both. On the contrary, the Court need not determine the extent of counsel's deficiency before determining if the defendant was prejudiced. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697.

Desper's Petition, like all *habeas* petitions alleging ineffective assistance of counsel, must be considered in the light of those principles.

## II. *Analysis*

### A. *With Respect to Trial Counsel*

In the Petition, Desper bases his argument on the premise that the Commonwealth of Virginia recognizes a defense based on the accused's specific diminished capacity, without reference to or a claim of insanity. Desper's claims of ineffective counsel, then, stem from his "defense [being] that he did not know and would not have known that [the victim] was incapacitated because of his own mental impairment," Petition, p. 3, ¶ 6, and that counsel was ineffective because she did not develop the evidence to prove that Desper's mental incapacity prevented his knowing or having the capacity to know that the victim was mentally incapacitated. Indeed, it appears that that claim is directly related to the trial court's observation, based on the evidence presented at trial, concerning Desper's ability "to discern the person with whom he was dealing."

> [Desper] may have been in Special Education, but there was
> nothing in that evidence that indicated anything other than that
> he may have had difficulties with academics. There is nothing
> that would indicate that he had difficulty dealing with people
> or assessing people. He just had academic problems. At least
> that is — that would be the reasonable inference with no more
> evidence than was presented in that regard.

The evidence is that he has married. The evidence is that he has a child. The evidence is that he is a functioning human being out there in real society. . . .

Moreover, while at the lower end of average, he is still at the lower end of average. And so I reject the evidence that [Desper] could not know, would not know, who he was dealing with.

Trial Transcript (Tr.), p. 158. Having recited that observation by the Court with respect to Desper's ability to know the circumstances (however unartfully the Court might have stated the matter in light of the law applicable to the case), Desper then details what counsel knew and what counsel, with more exhaustive investigation, should have known to illustrate the extent of Desper's mental disabilities. With those observations, Desper claims (as I noted above) that counsel at both the trial and sentencing stages of the proceeding "missed extraordinary evidence showing that [Desper] . . . was mentally retarded and that he had overlaying mental issues affecting his ability to perceive as an average intelligent person might." Petition, p. 16, ¶ 25.

The only critical element of the statutory rape charges was whether [Desper] knew or should have known that [the victim] was mentally incapacitated to consent to sexual intercourse. *White v. Commonwealth*, 23 Va. App. 593, 595 . . . (1996) ("that at the time of the offense appellant knew or should have known of complainant's condition.")

*Id.*, p. 17, ¶ 28. Desper apparently relies entirely on the cited observation by the Court of Appeals in *White* as his authority for the judicial construction of the final dependent clause of the statutory definition of "mental incapacity." To be sure, in that case, the Court did recite the elements of the crime which the Commonwealth must prove, including "that, at the time of the offense, appellant knew or should have known of complainant's condition." *White v. Commonwealth* at 595.

Desper's reliance on the decision in *White* as authority for his argument is misplaced. In *White*, the issue was not whether the defendant knew or should have known of the victim's condition; rather, it was whether the victim suffered from a mental incapacity as defined by Va. Code Ann. § 18.2-67.10. The Court's observation regarding the knowledge of the defendant was *dictum* at best, but it appears to be no more than part of a complete statement of the relevant code section. It offers no insight as to what is required of the Commonwealth to prove that the defendant "knew or should have known." Indeed, in *White*, as in Desper's case, the defendant admitted to having engaged in a sexual act with the victim but maintained

that it was consensual. However, in *White*, as in Desper's case, although consent might have been a defense to White's having acted with force, it was no defense to his having had sexual intercourse with a person with a mental incapacity, as to whom consent is irrelevant. In *White*, unlike the facts in Desper's case, the issue was not whether White knew or should have known of the victim's limitations but whether the Commonwealth proved that the victim was, in fact, suffering from a mental incapacity.

The Commonwealth relies on *Stamper v. Commonwealth*, 228 Va. 707 (1985), and *Peeples v. Commonwealth*, 30 Va. App. 626 (1999), for the principle that mental disability, short of insanity, is not a defense. Although those cases are helpful, they are not dispositive of the question before the Court.

In *Stamper*, the issue was whether the trial court erred in refusing to admit "evidence to prove the defendant's mental state. . . ." *Id.* at 710. Stamper sought to introduce psychiatric evidence that he suffered from manic-depression, was in a manic state at the time of the offense, and was incapable of forming the requisite specific intent. The Court noted that recognizing a defense of "diminished capacity" would be a fundamental change in the common law and expressly declined to adopt it. *Id.* at 716.

> [T]he common law, many years ago, fixed a stable and constant standard of mental competence as the criterion for the determination of criminal responsibility. A person whose mental state falls outside the borderline drawn by that standard is deemed legally insane. All persons inside that borderline are "presumed to be sane, and to possess a sufficient degree of reason to be responsible for [their] crimes.". . .
>
> Unless an accused contends that he was beyond that borderline when he acted, his mental state is immaterial to the issue of specific intent. Accordingly, we hold that evidence of a criminal defendant's mental state at the time of the offense is, in the absence of an insanity defense, irrelevant to the issue of guilt.

*Id.* at 716-17 (citations omitted).

The decision in *Stamper* apparently settles a question unanswered in *Waye v. Commonwealth*, 219 Va. 683 (1979). Faced with an argument that a decision in the earlier case of *DeJarnette v. Commonwealth*, 75 Va. 867 (1881), recognized a defense of diminished capacity, the Court in *Waye* commented: "We need not and, therefore, do not decide in this case whether the defense of 'diminished capacity' is or should be the rule of general application in Virginia." *Waye* at 695. That comment not only dismissed the issue as it was presented in *Waye*, but called into question the ambiguous holding in *DeJarnette*. With respect to the latter, although there is a two

line phrase which, by negative implication, appears to support a defense of diminished capacity, the holding does not do so, and that was not the issue that was before the Court.

In *Peeples*, the issue, again, was whether the trial court erred in refusing to admit expert testimony regarding the defendant's mental state. However, in *Peeples*, rather than its being a question of a diagnosed mental illness, the issue was whether Peeples' mental retardation was relevant to his defense of self-defense, specifically "whether he acted while reasonably provoked by fear or rage and whether he reasonably feared death or serious bodily injury." *Id.* at 630. Similar to the evidence which Desper argues his counsel insufficiently developed, Peeples argued that his psychologist would have offered testimony tending to show that Peeples "was mildly mentally retarded and that, because of 'the particular way that [his] mind is affected, he [had] extreme difficulty correctly interpreting social situations'." *Id.* at 629.

Unlike *Stamper*, in which the issue was whether the mental illness prevented the defendant's forming the requisite specific intent, the Court in *Peeples* addressed the issue of whether the defendant's mental retardation impaired his ability correctly to interpret the factual context which gave rise to his assuming that he needed to defend himself. Certainly, one might persuasively argue that the differences both in the underlying mental conditions (a diagnosed mental illness as opposed to a more general intellectual disability) and in the specific element of the crime potentially impacted by the mental disability (the formulation of intent as opposed to the perception of facts) would be a basis for distinguishing *Peeples* from *Stamper*.

In fact, in his dissent, Judge Benton vigorously maintained that the impact of a defendant's state of mind in electing to defend himself was governed by a fundamentally different set of rules than determining his state of mind in formulating intent. "Unlike other tests used to evaluate whether conduct was legally 'reasonable,' the Supreme Court has emphasized that the test of whether an accused's fear was sufficiently reasonable to justify acting in self-defense is based upon the accused's subjective point-of-view rather than the reaction of an ordinary person to similar circumstances." *Id.* at 643 (citations omitted). Judge Benton maintained that *Stamper* was not controlling "because the issue of Peeples's mental state was properly at issue once he raised [the issue of self-defense]. As the Supreme Court has noted, an accused's state of mind is a 'crucial issue' to determining whether his or her fear of serious bodily harm was subjectively reasonable under the circumstances. *Jones [v. Commonwealth]*, 217 Va. at 228, 228 S.E.2d at 125." *Id.* at 637.

Nevertheless, notwithstanding the differences, and rejecting the analysis of the dissent, the Court in *Peeples* concluded that the decision in *Stamper* controlled, although it is not clear how narrowly the decision in *Peeples* should be applied, perhaps limiting it to the facts of the specific case.

> An opinion that the defendant suffered a mental disability that rendered him vulnerable to misunderstanding a social situation is the type of gradation or classification of the defendant's mental state too subtle and shifting to form the basis for excusing his use of deadly force. In this instance, the expert's opinion evidence was not relevant to prove that the defendant acted to defend himself from a threat of imminent bodily harm, or that he was provoked or acted in the heat of passion. Though this is not to say that expert testimony is never admissible in support of the defenses of heat of passion or self-defense.

*Id.* at 634. The final sentence fragment of that concluding observation on the issue left open the door for evidence of the sort rejected in *Peeples* to be admissible in other contexts, and the Court's references to "the defendant" in the first sentence and to "this instance" and "the defendant" in the second at least imply that the decision could (perhaps should) be limited to the facts of the case.

Even if the decision in *Peeples* is either limited to its facts or, worse, a flawed analysis of *Stamper*, the case of *Funk v. Commonwealth*, 2003 Va. App. LEXIS 383 (2003), an unpublished decision, gives some insight to what the law on this issue is, or (given that it is of no precedential value) at least some indication of the direction in which the law is moving. The issue in *Funk* was whether the trial court erred in excluding expert testimony to address the defendant's diminished mental capacity. The evidence, taken in the light most favorable to the Commonwealth, showed that Funk had inflicted injuries on an infant by severely shaking him. Funk sought to introduce evidence to show that, due to his limited mental capacity, any injury he inflicted on the child "was likely due to his lack of understanding of the fragility of infants. . . ." *Id.* at 3. The Court's decision described him as "mentally retarded with an IQ of 65," *id.* at 2.

Relying on both *Peeples* and *Stamper*, the panel rejected Funk's argument, noting that Funk "sought to establish that he did not fully comprehend the fragility of the victim or the consequence of his mental retardation. Absent an insanity defense, the trial court cannot consider expert opinion of a defendant's mental state." *Id.* at 5-6.

I fully appreciate that it may be inappropriate to cite an unpublished opinion, and, as I noted, I recognize that it is of no precedential value, but the decision was one written and endorsed by a powerful panel of legal thinkers (affirming the decision of a superb trial judge), and the reasoning of all of those judges, while not binding, is persuasive. Funk, functioning at a lower IQ than Desper, was dealing with a six-week old victim unable to care for himself because of his age (from which one must infer that the victim suffered from both physical and mental limitations). The excluded evidence was that Funk, because of his lack of understanding, might have

played with "a one-month-old child in the same manner as he would play with a one-year-old child." *Id.* at 3. Even so, Judges Bumgardner, Elder, and Kelsey (not to mention Judge Wetsel, whose opinion was affirmed) endorsed the principle that "there is no sliding scale of insanity." *Stamper* at 688. It is worth noting that Judge Bumgardner wrote the opinion in *Peeples* and in *Funk* and Judge Elder, having dissented in *Peeples*, joined the opinion in *Funk* and later wrote the opinion affirming the trial court's decision in Desper's appeal.

To be sure, in *Funk*, there was no definition of a term ("mental incapacity") appearing in the criminal statute, which, by its incorporation, creates as an element of the crime (that the defendant "knew or should have known" of the condition of the victim). That incorporation, of course, gives rise the necessity of interpreting the defined phrase, and the Court of Appeals in Desper's case addressed that issue by establishing the standard the Commonwealth must meet to prove that element of the crime.

For that purpose, the Court in *Desper v. Commonwealth*, 2011 Va. App. LEXIS 343 (2011), looked to the case of *State v. Olivio*, 589 A.2d 597 (N.J. 1991). As I have acknowledged, I know the limitations imposed on the use of unpublished decisions, but, whatever they may be with respect to other cases, this unpublished decision is the law of the case about which Desper complains in his Petition. It is interesting to note, too, that the decision in *Desper* was written by Judge Elder who had joined Judge Benton, twelve years earlier, in his dissent in *Peeples v. Commonwealth*, 30 Va. App. 626 (1999). In that earlier case, he adopted Judge Benton's analysis in drawing a distinction between the impact of mental retardation on a defendant's perception of the factual circumstances in which he was acting and the impact of a mental illness on a defendant's formulation of intent. By joining the panel in *Funk* and by writing the opinion in *Desper*, it appears that Judge Elder has abandoned his support of the defense which Desper seeks to establish.

Certainly, the facts of *Olivio* are different from the facts in this case, but our Court of Appeals nevertheless adopted the New Jersey Court's construction of the relevant language contained in a statute prohibiting sexual intercourse by a person who "knew or should have known" that his partner was mentally defective. *Olivio* at 600. Our Court of Appeals recognized the disjunctive components of the requisite knowledge and agreed that the "[d]efendant can avoid liability only if neither . . . [knowledge] element is proved." *Desper* at 14.

The Court was quoting from *Olivio* but observed that this language was cited with approval in "*White v. Commonwealth*, 20 Va. App. 332, 343 (1995)." *Id.* at 14. That observation is incorrect; the volume and page number in the citation is correct, but the name of the case which cited *Olivio* with approval was *Adkins v. Commonwealth*. Even at that, the quote is taken out of context because *Adkins* did not deal with the defendant's

state of mind at the time of the offense; the issue there was the admissibility of evidence to show whether the victim suffered from a mental incapacity. Nevertheless, the Court's pronouncement is the law of this case.

> "Specific intent is not required." *Olivio*, 589 A.2d at 607. The standard "knew or should have known" requires, instead, proof of criminal negligence. *Noakes v. Commonwealth*, 280 Va. 338, 346, 699 S.E.2d 284, 289 (2010). It is well established that to prove criminal negligence, the Commonwealth must prove "the conduct of the [accused] constitutes a great departure from that of a reasonable person . . . which creates a great risk of [harm] to others and where, by the application of an objective standard, the accused should have realized the risk created by his conduct. *Keech v. Commonwealth*, 9 Va. App. 272, 280, 386 S.E.2d 813, 817 (1989)."[2]

*Desper* at 14-15. Given that a defendant's conduct, in acting on what he knew or should have known, is to be gauged by the conduct "of a reasonable person" and is governed by "the application of an objective standard," it is clearly not driven by what the specific actor knew or could have known, taking into account his subjective limitations, nor is it to be measured by his subjective ability to assess the context in which he acts. That directly addresses Desper's assertion that his counsel "missed extraordinary evidence showing that [he] . . . was mentally retarded and that he had overlaying mental issues affecting his ability to perceive as an average intelligent person might." Petition, p. 16, ¶ 25. Short of a defense of insanity, Desper, and any defendant accused under Va. Code Ann. § 18.2-61, is held to an objective standard, and that is the standard of a reasonable person. Hence, all of the evidence which he maintains his counsel should have developed and introduced would have been irrelevant and inadmissible because it is directed to a defense which the Commonwealth does not recognize.

## B. *With Respect to Counsel for the Sentencing Phase*

Desper argues that his counsel at the sentencing phase of the trial was ineffective for the same reasons as was counsel at the guilt or innocence phase, and, in support for that proposition, he relies on the decision in *Williams v. Taylor*, 529 U.S. 362 (2000). That is a *habeas* case arising from the Commonwealth in which a jury found Williams guilty of capital murder and sentenced him to death. There was no issue regarding Williams' representation at the trial at the guilt or innocence phase; the focus of the

---

[2] That language is consistent with an additional direction by the Court in *Olivio*: "*See People v. Davis*, 102 Mich. App. 403, 301 N.W.2d 871, 873-74 (1980) (statute saying actor 'knows or has reason to know' of mental defect eliminates liability only 'where the mental defect is not apparent to reasonable persons')." *Id.* at 607.

Court was whether counsel failed adequately to present evidence at the sentencing phase that might have rebutted the Commonwealth's compelling evidence that Williams had been convicted, over the period from 1976 to 1986, of armed robbery, burglary, grand larceny, auto theft, two violent assaults (one of which was described by the Court as brutal) on elderly victims, and arson, and also might have rebutted the expert testimony that there was a high probability that Williams would pose a serious threat to society. Although defense counsel called Williams' mother, three neighbors, and a psychiatrist, whose testimony would best be characterized as collateral to the core issue, the Court observed that that the "weight of defense counsel's closing . . . was devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life." *Id.* at 369. Moreover, there was a wealth of evidence, not presented by (or known to) defense counsel concerning Williams' background which impacted on his proclivity toward violence, or lack of it, or the circumstances in which it was unlikely to manifest itself.

The sentence imposed by the jury in *Williams* was the ultimate sanction, death. At the evidentiary hearing on the *habeas* petition, the trial court concluded that "the performance of defense counsel, in the main, during the penalty phase proceedings did not warrant habeas relief." *Williams v. Warden of the Mecklenberg Correctional Center*, 254 Va. 16, 21 (1997). (I will refer to the Virginia case as *Williams-Warden* to distinguish this case from the *Williams* case decided by the United States Supreme Court.) Nevertheless, observing that there was little evidence presented regarding mitigation (and the *habeas* petition indicated that there was a wealth of it that should have been presented) or of evidence that, in structured settings, the defendant's conduct was good, the trial court finally commented that "it is troubling . . . that favorable evidence was not pursued and introduced for 'whatever it was worth' when the decision which was to be made by the jury involved life or death." *Id.* at 22.

> Summarizing, the [trial] court opined that at "a capital murder sentencing, *any* evidence which might be favorable or mitigating can mean the difference between 'life or death'." Continuing, the [trial] court stated that "mitigating testimony is absolutely crucial and if none is offered, this amounts to prejudice." In addition, the [trial] court said that a failure "to present favorable mitigation evidence which was available upon investigation and development falls below the range expected of reasonable, professional competent assistance of counsel, and because this evidence is so crucial to the outcome of the jury's ultimate decision of life or death, it is prejudicial to a defendant when it is not presented at the sentencing phase." This is such a case, according to the [trial] court,

> because "Terry Williams needed anything and everything that might be available as favorable evidence to persuade the jury to save his life. Anything less was not enough."

*Id.* (emphasis in original). I have included that extensive cite not only to emphasize that the issue was one of life and death but to note that, according to the trial court, any stoned unturned to discover and develop mitigating evidence would have resulted both in ineffective counsel and, *a priori*, in prejudice. The trial court's logic was faulty, and our Supreme Court observed: "Unfortunately, the circuit court appears to have adopted a *per se* approach to the prejudice element." *Id.* at 26.

The Virginia Supreme Court observed that it was a question of fact whether there was "evidence in mitigation that was available but not presented," *id.* at 24, and agreed that there was no dispute that there was such evidence. Nevertheless, applying what the United States Supreme Court later announced to be a flawed analysis, the Virginia Supreme Court found that Williams had not proved prejudice.

The Virginia Supreme Court fully recognized the requirements of *Strickland*, including the obligation of the defendant to prove "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." *Strickland*, at 687. However, looking to *Lockhart v. Fretwell*, 506 U.S. 364 (1993), the Court also noted that the United States Supreme Court had held that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Id.* at 364. "[T]here are also situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate 'prejudice'." *Williams* at 391-92. With those observations (and with no apparent emphasis on the latter), the Virginia Supreme Court rejected Williams' assertion that there was a reasonable probability that, "had at least one juror heard *any* of this evidence — let alone all of this evidence — the outcome of this case would be different." *Williams-Warden* at 25. The Virginia Supreme Court rejected that argument, not because there was no mitigating evidence but because, on a mixed question of fact and law, the Court concluded that Williams' argument "flies in the face of the Supreme Court's admonition in *Lockhart*," *id.*, but also that Williams' "assertions about the potential effects of the omitted proof do not establish a 'reasonable probability' that the result of the proceeding would have been different, nor any probability sufficient to undermine confidence in the outcome. Therefore, any ineffective assistance of counsel did not result in actual prejudice to the accused." *Id.*

That language tracks the holding in *Strickland* in articulating the appropriate test for prejudice: "The defendant must show that there is a reasonable probability that . . . the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. The United States Supreme Court

emphasized the Virginia Court's first observation and ignored the second. However, the comparison of the language used by the Virginia Supreme Court to the language of *Strickland* calls into question the conclusion of the United States Supreme Court that the Virginia Supreme Court did not use the correct standard in analyzing the ineffective assistance claim, *Williams* at 395, an observation correctly noted by the minority. *Id.* at 417-18. At worst, the Virginia Supreme Court considered alternative theories.

"The mitigation evidence that the prisoner says, in retrospect, his trial counsel should have discovered and offered barely would have altered the profile of this defendant that was presented to the jury. At most, this evidence would have shown that numerous people, mostly relatives, thought that defendant was nonviolent and could cope very well in a structured environment. Of course, those assumptions are belied by the four-month crime spree beginning with the present crimes and by the defendant's current attitude while in jail toward other inmates." *Id.* at 26.

In the United States Supreme Court, the questions presented were "whether [Williams'] constitutional right to the effective assistance of counsel as defined in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), was violated and whether the judgment of the Virginia Supreme Court refusing to set aside his death sentence 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' within the meaning of 28 U.S.C. § 2254(d)(1) (1994 ed., Supp. III)." *Williams* at 367.

In an otherwise fragmented decision (largely addressing federal power in *habeas corpus* cases arising from the States), the United States Supreme Court held, on the one issue that is relevant to this proceeding, that the Virginia Supreme Court had applied the wrong standard of law. *See* Section IV of the opinion, written and announced by Justice Stevens and joined by Justices O'Conner, Kennedy, Souter, Ginsburg, and Bryer. Because of that, the United States Supreme Court held that the Virginia Supreme Court erred in overturning the trial court's determination that Williams had satisfied the two-pronged standard of *Strickland* and was entitled to a new sentencing hearing. It is not necessary to describe in detail the specific procedural issues which the Supreme Court addressed in *Williams*, but is it helpful to recite with some particularity the basis for the Supreme Court's reversal of the Supreme Court of Virginia as to the latter's comments on *Lockhart*.

What is curious about the decision in *Williams* is that the United States Supreme Court overlooked the holding of the Supreme Court of Virginia. Adopting language directly from *Strickland*, the Virginia Court held:

> Drawing on *Strickland*, we *hold* that, even assuming the challenged conduct of counsel was unreasonable, the prisoner "suffered insufficient prejudice to warrant setting aside his death sentence," 466 U.S. at 698-99. . . . What the Supreme

Court said in *Strickland* applies with full force here: "Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." 466 U.S. at 700.

*Williams-Warden* at 26 (and note, citing directly to *Strickland*) (emphasis added). Instead, the United States Supreme Court focused on a later comment by the Virginia Supreme Court, in *dictum*, that the analysis of the trial court demonstrated "an emphasis on mere outcome determination, without proper attention to whether the result of the criminal proceeding was fundamentally unfair or unreliable." *Id.* at 27.

What is remarkable about its decision in *Williams* is that the United States Supreme Court elected to decide the case on its own, rather than to remand it to the Virginia Supreme Court to decide the case with corrective instructions as to the limitations of *Lockhart*.

Perhaps the Court realized, but did not acknowledge, that the Virginia Supreme Court already had properly applied the rule of *Strickland* and that our Court's finding on the mixed question of fact and law differed from its own. In any event, it is clear that the majority in *Williams* did make its own finding on the issue: "We are also persuaded, unlike the Virginia Supreme Court, that counsel's unprofessional service prejudiced Williams within the meaning of *Strickland*." *Williams* at 396.

Instead, the United States Supreme Court accepted the judgment of the trial judge who heard the *habeas* petition and determined not only that Williams' counsel was ineffective but that his conduct was prejudicial to Williams' having a fair hearing at the sentencing phase.

Having said all of that, acknowledging that *Williams* is controlling and that it articulates (or reaffirms) some principle concerning mitigation evidence in the sentencing phase of a capital case, I suggest that *Williams* must be considered in the context in which it was decided and the precedential scope of the decision must be considered in the light of the life or death stakes which were involved. If the decision is to be precedent for a review of every sentencing proceeding in every case in which, in hindsight, an attorney leaves no stone unturned in investigating and developing mitigation evidence, then every sentencing hearing, regardless of whether the case is a capital one, will result in a *habeas* proceeding with an appellate court making the final decision regarding the mixed question of fact and law. Perhaps this is an example of the "the distorting effects of hindsight" condemned in *Strickland*. Happily, the United States Supreme Court has not applied the relevant part of the *Williams* decision (its requirement of an exhaustive search for any and all mitigating evidence) in any case which did not involve a capital murder or the imposition of a death sentence.

Indeed, although the concept of offering mitigating evidence at a sentencing phase of a trial is not new law, it may be that the expansive obligation at the sentencing phase is limited to capital cases. *See* the *dictum* to the dissent in *Chaidez v. United States*, 133 S. Ct. 1103, 1115 (2013): "[W]e found that *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), 'made no new law' when it held that *Strickland* extended to an attorney's responsibility to conduct a background investigation in a capital case."

I have examined each of Desper's tabs and the documents behind them. Many of the pages behind the tabs add gravitational, but no substantive, weight to the inquiry. Many of the documents are no more than forms, and much of it is repetitive. Moreover, little of it, taken in the very best light, would have helped Desper had it been presented.

Without attempting to address each document, but having reviewed all of them (with the exception of some hand-written ones which I cannot decipher), I note the following, with the numbered items corresponding to the tabs.

1. The trial transcript clearly adds nothing of which the Court was unaware at both stages of the trial.

2. This is a selection of records from the Juvenile and Domestic Relations District Court, all of which appear to relate to court action regarding Desper's child, specifically with respect to the entry of protective orders of various flavors and awarding custody of the child to parties other than Desper and the child's mother. All of the documents are from late 2006 or 2007; all but one of the orders are over my signature. (I was a Judge of the Juvenile and Domestic Relations District Court at the time.) None of the Court's findings support the proposition for which Desper now seeks to use them. There is a quotation of one comment by a person to whom the Court gave custody of the child to the effect that she was "concerned about whether or not the Despers are sufficiently familiar to know about what the child's abilities and limitations are at her age." Although that colorably supports Desper's perceptual limitations, it is clear that it was the hearsay comment of a party to the proceeding, dutifully recorded by the Court and the inability of a parent to recognize his child's limitations is, lamentably, not an uncommon problem appearing in the Juvenile and Domestic Relations District Court. Perhaps the most compelling fact bearing on the issue of prejudice created by the fact finder's not knowing of the contents of these documents is that the fact finder at the sentencing hearing *did know* of the previous proceedings.

3. This tab (entitled Social Security Administration records) consists of form applications and supplemental applications for Desper to obtain SSI payments resulting from an unspecified disability commencing on August 23, 2001, as well as a collection of medical and psychiatric records from various hospitals. The nearest thing to a relevant comment statement on any

of the social security applications is a "Report of contact" to the effect that "mother thinks Jamie is not capable and requests capability development." The primary diagnosis of the disability is "Affective Disorders." Neither of those is instructive on the issue which Desper now raises. Also, behind the tab is a discharge summary dated December 10, 2000, when Desper was seventeen years old. The release document is from Desper's having been admitted to Centra Health (Virginia Baptist Hospital) after he attacked his father with scissors because his father would not permit Desper to stay at his aunt's house. Behind the tab are also notes from Timothy J. Kane, M.D., showing a diagnosis of "bipolar disorder, not otherwise specified" and an initial psychiatric assessment, dated January 29, 2002, stating that Desper said that "he does things without thinking about them," that he has a history of "poor temper and irritability," and that "he had been hospitalized at Virginia Baptist in 2000" as a consequence of threatening his father with a knife. Behind the tab is also a psychiatric history, dated June 24, 2002, which was generated when Desper was admitted after having attacked his mother and "apparently" attempting suicide while on probation for an embezzlement conviction. The doctor noted that his thinking was "logical and coherent," although his "insight was poor; his impulse control was poor; his social judgment was poor." The psychiatric discharge summary, dated June 26, 2002, stated that there was "no reason for continued psychiatric treatment." The tab also contains an psychological assessment by Joseph J. Cianciola, Ph. D., dated March 30, 2003, in which Cianciola observes that Desper has an "extensive history of inpatient psychiatric treatment and is currently under the care of a psychiatrist," that his intellectual assessment puts him in the "borderline range," but that "those results are significantly lower than would be expected given [Desper's] current academic performance."

There is no question that the documents behind Tab 3 indicate that Desper suffers from some mental, intellectual, or psychological disabilities, but there is no document there, the lack of which would have prejudiced him in either phase of the trial.

4. This tab consists of educational documents and another copy of the documents from Centra Health (Virginia Baptist) (with a few pages that appear for the first time). The documents behind Tab 4 indicate that Desper suffers from some disabilities, but there is no document there, the lack of which would have prejudiced him in either phase of the trial.

5. This tab consists of records from Middle River Regional Jail, and, unless one is interested in knowing that Desper had a build-up of ear wax, an episode of dizziness, and some tooth decay (and that he sometimes refused medical care), it is unclear why the documents have been included. There is certainly no document there, the lack of which would have prejudiced him in either phase of the trial.

6. This tab consists of records from Woodrow Wilson Rehabilitation Center which reflect that Desper suffered from a bipolar disorder and

alcohol dependence. A summary also recognized that Desper had academic limitations and "low problem solving abilities" and suggested that he participate in support groups, such as AA, to "reduce the likelihood of a relapse," that he might "benefit from a hands-on two week evaluation," and that he might benefit from working with a literacy volunteer, noting that he tested at a second grade level for reading comprehension and at a sixth grade level for vocabulary. The documents make it apparent that Desper's expectations of job opportunities open to him exceeded his abilities. Also behind this tab is a psychiatric evaluation, dated November 4, 2004, by Dr. James Krag. Apparently not having tested Desper, Dr. Krag estimated that his "level of intelligence is below average and he has limited insight." Krag appeared to question the previous diagnosis of bipolar disorder and suggested that the diagnosis of schizophrenia by Western State Hospital might be more accurate.

The documents behind Tab 6 indicate that Desper suffers from some academic and emotional disabilities, but there is no document there, the lack of which would have prejudiced him in either phase of the trial.

7. This tab consists of documents concerning the removal of Desper's child by the Department of Social Services. Other than providing a history of the removal, I can see nothing the lack of which would have prejudiced Desper in either phase of the trial.

8. This tab consists of records from Western State Hospital for October 2003. (It was after this hospitalization that Desper went to see Dr. Krag.) Among the findings in the clinical process notes (showing an admission date of October 23, 2003, and a discharge date of October 30, 2003) are that Desper's "thought processes seemed logical and linear. His judgment is poor. His insight is fair and his intelligence is average."

The documents behind Tab 8 indicate that Desper suffers from some mental or psychological disabilities, but there is no document there, the lack of which would have prejudiced him in either phase of the trial.

9. This tab consists of the competency evaluation which Dr. Rawles prepared prior to the trial. That document is a part of the record and was available at trial.

10. This tab is a clinical interview and progress note with dates of service of November 21, 2005, and December 12, 2005 (although it appears on the document as "12/12/15"). The only new information it adds to the other documents is that Desper is right-handed. During the interview, the psychologist observed that Desper's "thought processes appear generally logical and linear, and there is no evidence of perceptual abnormalities. Insight and judgment appear fair. . . ." There is no document there, the lack of which would have prejudiced him in either phase of the trial.

11. This tab is the Criminal History from the Pre-sentence Report. That document is a part of the record and was available at the sentencing phase of the trial.

12. This tab is an affidavit of Peggy Moore of Vector Industries stating only that Vector employs people with disabilities and that it employed Desper. I am not certain why the tab is included.

13. This tab is an affidavit of Glenda Desper, Desper's mother, who described what the trial attorney discussed with her and what Desper discussed with Desper's current attorney. Ms. Desper confirms that Desper was lacking in academic skills, that he lacked common sense, and she described other indicia of Desper's mental, intellectual, or academic disabilities. The only comment specifically relevant to the defense which Desper seeks to raise is that he "tended to associate with [children who] were also intellectually challenged like himself or very young and immature. He saw and treated girls who were intellectually challenged like himself as normal."

Even without considering the issue of Ms. Desper's bias, she offers support for a defense to Desper's crime which, as I have noted, is not available to him in the Commonwealth, so her comment has no impact on counsel's performance at the guilt or innocence phase. For reasons which I will address below, the lack of her testimony also did not prejudice Desper at the sentencing stage. Further, I note that she testified at a bond hearing and at the sentencing phase of the trial and related much of what appears in the affidavits.

14. This tab is an affidavit of Angela Beverage, stating that Desper's wife, Ann, was intellectually impaired and she and Desper were alike. Her testimony would have been of no consequence to the proceeding.

15. This tab is an affidavit of Mary Pat Lane, a special education teacher for Desper when he was in high school. Her observation was that Desper's friendships were largely with people "whom he perceived to be like him, with similar personalities and level of maturity." "Jamie could not tell people's ages, but rather saw people as those with whom he had something in common. He would not, for instance, know if someone had an intellectual incapacity because he only identified with people who had the same limitations as he did. He had no insight or perspective about other people and gravitated to people like himself." It is not clear that much of Ms. Lane's testimony would have been admissible (unless she were qualified to give an expert opinion as to what Desper "would have known" and whether he had "no insight or perspective about other people"). In any event, for the reasons I will address below, the lack of Ms. Lane's testimony did not prejudice Desper at the sentencing phase.

16. This tab is an affidavit of Duane Barron, an attorney in the Office of the Public Defender who reviewed Desper's file after Lincoln, the trial attorney, had left the office. He confirmed what was and was not in the file. That affidavit is relevant only if there is information that was not developed that supports Desper's claim.

17. This tab is the affidavit of Daphne Lincoln addressing what she did and did not do in assembling information in preparation for the trial. That affidavit is relevant only if there is information that was not developed that supports Desper's claim.

18. This tab is a synopsis of the family life education program of the Roanoke County Public School System with an unsigned opt-out form. In the Petition, Desper suggests that the complainant took the course, but that is not relevant to what Desper knew or did not know; at best, it is relevant to whether the complainant suffered from a mental incapacity, and that is not the basis for the Petition.

19. This is a case report of the Augusta County Sheriff's Department with notes of the investigating officers. In his Petition, Desper asserts that counsel at the guilt or innocence phase did "not review . . . more than a thousand text messages to share with an expert in the field of development disabilities." However, Desper does not suggest what those messages might have contained, whether they were to or from Desper, or how that could have prejudiced him.

20. This is an affidavit of Michael L. Hendricks, Ph. D., who detailed the documents he reviewed (and it appears that he reviewed all or most of the information appearing behind the tabs discussed above). Based on that information, Dr. Hendricks opines that persons like Desper do "not have the capability to assess the abilities of others to make decisions and to exercise good judgment. . . . Persons with ID do not perceive any incapacitation in decision making in these peers any more than they perceive such incapacitation in themselves." Given other factors, "it is expected that these conditions would have contributed to [Desper's] exceedingly poor judgment and inability to assess and perceive a possible incapacity of another person, especially when the other person had a disability like his own."

I suspect that Desper is offering Dr. Hendricks' opinion as support for a defense which, as I have noted, is not available to Desper in the Commonwealth, that is, that Desper did not know or could not have known about the complainant's mental incapacity (*i.e.*, her lack of understanding of the nature or consequences of her action). However, even if the defense were recognized in the Commonwealth, an expert opinion that Desper did not have the capability to assess the complainant's ability "to make decisions and to exercise good judgment" is not necessarily an opinion that Desper did not have the capability to know that the complainant did not understand the nature or consequences of a sexual act. Indeed, it is not the victim's ability to decide to have sex that is at issue; it is the victim's lack of understanding of the nature and consequences of the act that makes it unlawful. The incapacitated person may be fully able to make a bad decision to consent to the act, may solicit it, may even enthusiastically participate in it, but it is her lack of understanding (not her lack of decisiveness) of what

she is doing that renders the other party's action unlawful. Dr. Hendricks' conclusion that factors would have "contributed to [Desper's] inability to assess and perceive a possible incapacity of another person" is too broad to be of any help.

Hence, the lack of Dr. Hendricks' opinion, even if the defense were available, would not establish prejudice as a result of counsel's performance at the guilt or innocence phase. Moreover, for reasons which I will address below, the lack of his testimony also did not prejudice Desper at the sentencing phase.

21. This tab is the affidavit of Dr. Ellen P. Ryan, who also detailed the documents she reviewed (and it appears that she reviewed all or most of the information appearing behind the tabs discussed above). Based on that information, Dr. Ryan concludes "Desper's intellectual and commensurate psychosocial deficits would have precluded his ability to assess an eighteen-year-old mildly intellectually disabled woman as being deficient in some way and unable to give informed consent for sexual activity. Jamie Desper would not have known that [the complainant] was mentally incapacitated to consent to sexual intercourse."

Unlike Dr. Hendricks' opinion (more equivocal and less precise than this one), Dr. Ryan's opinion does offer support for the defense which Desper seeks to raise. However, because the defense is not available to Desper, her comment has no impact on counsel's performance at the guilt or innocence phase. For reasons which I will address below, the lack of her testimony also did not prejudice Desper at the sentencing phase.

In *Williams*, the United States Supreme Court deferred to the decision of the Judge of the trial court in his determination of whether the lack of mitigating evidence was prejudicial to the defendant. The Court put weight on the fact that it was "the Circuit Court (the same judge who had presided over Williams' trial and sentencing) [who] held an evidentiary hearing on Williams' claim that trial counsel had been ineffective," *id.* at 370, and found that they were. Unlike the circumstances in *Williams*, no one need speculate about what impact the proposed evidence would have on the jury in its deliberations as to a sentence. In the case pending in this Court, I was the judge who presided at both phases of the trial, and I have reviewed all of the evidence which Desper has submitted in support of his claim of ineffective counsel.

Having already ruled that counsel at the guilt or innocence phase was not ineffective, I now rule both that counsel at the sentencing phase was not ineffective, and, even were an appellate court to disagree with me on that issue, I further rule Desper was not prejudiced by counsel's failure to develop and present the evidence which Desper has offered in support of his claim. In my comments on the information appearing behind each tab, I have already noted that most of it is of little consequence. Even so, taking

all of it in the light most favorable to Desper's position, the purported mitigating evidence would not have altered the Court's decision regarding the sentence imposed.

In my summation at the sentencing hearing, I recognized that Desper was a young man, that he was "of limited mental capacity — limited intellectual capacity" (Tr. at 188), and that the sentence was a long one. I accepted that he chose his friends (sadly, some of whom were victims) from the pool of other people with limited mental capacity, and I noted (in different words) that that was a recipe for disaster. Desper had been convicted of a violation of Va. Code Ann. § 18.2-370 in September 2007, he had been sentenced to five years with three years six months suspended, and, less than a year after his release from incarceration, he had committed the acts for which he was on trial.

The evidence which Desper maintains should have been offered in mitigation would neither have diminished the Court's concern about "what happened but three years ago," nor allayed its concern about "what might happen three years from now." *Id.* at 190. The issue which Desper raises in his Petition was already weighing heavily on the Court's mind, but, in the balance, it did not (and would not) tip the scales to the imposition of a lesser sentence which would have exposed the public to the risks he presented, particularly the risks he presented to those who are the most ill equipped and least able to protect themselves.

### III. *Summary and Conclusion*

With respect to the case as it applies to Desper's trial counsel at the guilt or innocence phase, it can be decided on the first prong of *Strickland*, without reaching the second prong. A fair assessment of Desper's attorney's performance, gauged in the light of the principles cited above, cannot lead to the conclusion that she was ineffective. Because the defense which Desper seeks to assert is not available to him, the evidence which he maintains should have been presented to support it would have been irrelevant.

With respect to the case as it applies to Desper's counsel at the sentencing phase, it is unnecessary to address the first prong of *Strickland*, although that is not to be construed as an endorsement that he was ineffective. Were the Court to have found him so, however, the case can be dismissed because counsel's failure to present the unknown or undeveloped evidence on which Desper now relies did not result in prejudice to him.

After considering Desper's claim and finding it to be without merit, the Court grants the Commonwealth's Motion and dismisses the Petition.