COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Huff, Chafin and Decker
Argued at Richmond, Virginia


KIN YIU CHEUNG

                                                          OPINION BY
v.        Record No. 0322-13-2               JUDGE TERESA M. CHAFIN
                                                      FEBRUARY 11, 2014
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CAROLINE COUNTY
Joseph J. Ellis, Judge

          Taylor B. Stone (Janus & Stone, on brief), for appellant.

          Katherine Quinlan Adelfio, Assistant Attorney General
          (Kenneth T. Cuccinelli, II, Attorney General, on brief), for
          appellee.


      Kin Yui Cheung ("Cheung") was convicted by the Circuit Court of Caroline County

("circuit court") of four counts of involuntary manslaughter in violation of Code § 18.2-36.  The

four victims in these cases were killed when a passenger bus driven by Cheung overturned on

Interstate 95 on May 31, 2011.  On appeal, Cheung argues that the evidence presented by the

Commonwealth was insufficient to support his convictions.  Specifically, he contends that the

evidence failed to establish that his actions preceding the bus accident "were so gross and

wanton [as] to show a reckless disregard of human life."  For the reasons that follow, we find

that the evidence presented was sufficient to support Cheung's convictions and affirm the circuit

court's decision.

I.  BACKGROUND

      "On appeal, 'we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom.'"  Archer v. Commonwealth,

26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)).  So viewed, the evidence establishes that Cheung drove passenger buses for a company doing business as Sky Express.  On May 30, 2011, a bus driven by Cheung departed from Greensboro, North Carolina, at 10:00 p.m. bound for New York City, New York.  The bus was scheduled to make stops in Raleigh and Durham, North Carolina; South Hill, Virginia; and Maryland, and arrive at its destination at 8:30 a.m.  The bus picked up passengers at several of these stops.  When the bus crashed around 5:00 a.m. on May 31, 2011, it held fifty-seven passengers.

A number of passengers made observations concerning Cheung's behavior and driving during the course of the ill-fated trip.  Two passengers, Jasmine Rivera ("Rivera") and Karrica Finch ("Finch"), stated that Cheung seemed confused when they boarded the bus in Raleigh. Rivera stated that Cheung seemed confused about taking her ticket, and Finch described how Cheung seemed to have difficulty counting passengers and tickets.  Additional passengers boarded the bus in Durham.  During this stop, Finch observed Cheung have an argument with another man outside of the bus.  Finch saw this individual give Cheung a bag containing energy drinks, and she saw Cheung consuming these drinks between Durham and South Hill.

After leaving Durham, Cheung made an unscheduled stop.  Cheung got off the bus without speaking to the passengers, and was seen looking underneath the bus and inspecting its tires. Two women then got off the bus to use the restroom.  When other passengers followed the women off the bus, Cheung became agitated and yelled at them for getting off the bus without his permission.  Cheung then returned to the driver's seat and threatened to leave the women who were using the restroom.  He began to drive away and only stopped when other passengers protested.  When the women returned to the bus, he scolded them for leaving the bus without his permission and told them that they would arrive late at their destination due to their actions.

Following this stop, Cheung spoke on his cell phone in Mandarin to an unknown party for a period of thirty minutes to an hour. Shirley Dai ("Dai"), a passenger who spoke Mandarin and was sitting in the front row of the bus, overheard his conversation. At trial, Dai testified that she heard Cheung complain that he did not get enough rest. Dai testified that Cheung told the person on the cell phone that:

> he doesn't get enough rest, every time he gets off the bus he heads over to his boss's place, they will have dinner and they will talk a little bit, he will shower and go to sleep, and then a couple of hours later he would need to get up and go back to work again.

Cheung stopped in South Hill to refuel, and the passengers were allowed to exit the bus at that time. Several passengers observed Cheung buying four or five cans of Red Bull, an energy drink, during this stop. Another passenger, Ronald Harris ("Harris"), observed Cheung buying a large cup of coffee. Harris, a professional bus driver with over fifteen years of experience, asked Cheung if he was "alright" when he boarded the bus following this stop. Cheung replied affirmatively and told Harris to get back on the bus.

Cheung's driving deteriorated after leaving South Hill. Harris testified that Cheung's driving before the crash was "not normal driving." Despite a light flow of traffic, Cheung drove erratically. Harris stated that Cheung would speed up and then slow down and that the bus was passed by the same tractor trailer three times. Harris testified that Cheung stopped using turn signals and that he felt the bus sway when Cheung changed lanes. Finch described the bus ride during this period as similar to being on a "roller coaster." Another passenger saw Cheung "hugging" the steering wheel, while another passenger saw the bus cross the lines on the highway several times after leaving South Hill and saw cars pull off the road to avoid the bus. This erratic driving lasted for at least an hour before the crash.

Around 5:00 a.m., the bus made a hard left turn after drifting to the right and flipped near mile marker 103 on Interstate 95 in Caroline County, Virginia. Prior to the crash, the bus drove

over the rumble strips on the right side of the road. When the bus hit the rumble strips, several passengers observed Cheung slumped toward the right side of the driver's seat with his head on his shoulder. Cheung did not react when the bus initially hit the rumble strips, and the bus coasted for a brief period after the incident. When Cheung woke up, he wrenched the steering wheel to the left to correct the position of the bus. This action caused the bus to lean to the left, lean back to the right, and flip. Four passengers died as a result of the crash.

Rick Hicks ("Hicks"), a professional long distance truck driver, observed the accident. He initially encountered the bus around mile marker 101. Hicks stated that the bus was traveling at a speed of less than sixty-three miles per hour and that Cheung was tapping his brakes. He observed the bus "swerving back and forth in the center lane" of the highway, and jerking to the right as other trucks passed. About two minutes after Hicks encountered the bus, it swerved into the left lane of the highway, hit the rumble strips on that side of the road, and moved back into the center lane. The bus then slowed down to approximately forty or fifty miles per hour. Hicks attempted to pass the bus, but the bus moved into the right lane and blocked Hicks as he approached. Hicks called 911. Shortly afterwards Hicks watched the bus sway to the right, overcorrect, and flip.

After the crash, Lindelle Cromartie ("Cromartie"), a bus passenger, attempted to help other passengers get out of the bus. While she was doing so, she heard Cheung say, "I'm sorry, I'm sorry, I fell asleep."[1] Virginia State Police Trooper Andrea Vowell ("Vowell") was the first officer to arrive on the scene. When she arrived, the bus was "still rocking" on its roof. After speaking with several passengers, Vowell spoke to Cheung, who identified himself as the driver of the bus. Although Cheung told Vowell that he had slept for six hours before leaving

---

[1] At trial, Cheung did not dispute that he fell asleep while driving the bus.

Greensboro,[2] Cheung told her that he felt tired. Cheung responded affirmatively when Vowell asked him if he had fallen asleep while driving the bus. Cheung told Vowell that he abruptly turned the steering wheel of the bus hard to the left when he awoke and that the bus flipped as a result. He wrote and signed a statement describing the accident indicating that "maybe [he] feeling tired and sleeping time [sic]." No alcohol or drugs were found in Cheung's system following the accident.

Trooper C.F. Rosemand ("Rosemand") of the Virginia State Police Motor Carrier Unit also investigated the accident. Although Rosemand noted that Cheung's log book was out of date, he indicated that it was within the parameters allowed by law. The last entry in Cheung's log book was made on the previous day during the time period that Cheung told Vowell that he was sleeping. Cheung told Rosemand that he was feeling tired and sleepy at the time of the accident, that he fell asleep while driving the bus, and that the bus flipped when he awoke and sharply turned the vehicle to the left. Rosemand did not ask Cheung how long he had felt tired before the accident occurred.

Following the crash, Cheung was charged with four counts of involuntary manslaughter in violation of Code § 18.2-36. Cheung pled not guilty to each of these charges. At trial, Cheung argued that his negligence did not constitute the degree of negligence required for involuntary manslaughter convictions. The circuit court disagreed, and found that Cheung's conduct supported the charges. The circuit court convicted Cheung of all four counts of involuntary manslaughter, and Cheung appealed his convictions to this Court.

---

[2] Specifically, Cheung told Vowell that he had slept from noon to around 6:00 p.m. on May 30, 2011. An entry in his log book, however, suggests that Cheung may have been awake during this time period.

## II. ANALYSIS

On appeal, Cheung argues that the evidence presented was insufficient to establish that his conduct was "so gross and wanton [as] to show a reckless disregard of human life." Although Cheung acknowledges that he acted negligently, he contends that his actions do not constitute the degree of criminal negligence required to support his involuntary manslaughter convictions. We disagree.

When an appellant challenges the sufficiency of the evidence supporting a conviction, "the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code § 8.01-680. When reviewing the sufficiency of evidence, this Court "must . . . ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (emphasis in original) (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)). "If there is evidence to support the conviction, an appellate court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion." Conrad v. Commonwealth, 31 Va. App. 113, 123, 521 S.E.2d 321, 326 (1999) (*en banc*) (quoting Presley v. Commonwealth, 256 Va. 465, 466-67, 507 S.E.2d 72, 72 (1998)).

Involuntary manslaughter in the operation of a motor vehicle is defined as an "accidental killing which, although unintended, is the proximate result of negligence so gross, wanton, and culpable as to show a reckless disregard of human life." King v. Commonwealth, 217 Va. 601, 607, 231 S.E.2d 312, 316 (1977). "[A] higher degree of negligence in the operation of a motor vehicle is required to establish criminal liability for involuntary manslaughter than to establish liability in a civil action for ordinary or even gross negligence. This higher degree of negligence

has come to be known as 'criminal negligence.'" Keech v. Commonwealth, 9 Va. App. 272, 277, 386 S.E.2d 813, 816 (1989). "Criminal negligence 'is acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct *probably* would cause injury to another.'" Conrad, 31 Va. App. at 122, 521 S.E.2d at 326 (quoting Tubman v. Commonwealth, 3 Va. App. 267, 271, 348 S.E.2d 871, 873 (1986)). Criminal negligence has also been defined as "conduct 'so gross and culpable as to indicate a callous disregard of human life.'" Keech, 9 Va. App. at 278, 386 S.E.2d at 816 (quoting Darnell v. Commonwealth, 6 Va. App. 485, 492, 370 S.E.2d 717, 720 (1988)).

"Inadvertent acts of negligence without recklessness, while giving rise to civil liability, will not suffice to impose criminal responsibility." King, 217 Va. at 606, 231 S.E.2d at 316. However, "'[t]he cumulative effect of a series of connected, or independent negligent acts causing a death may be considered in determining if a defendant has exhibited a reckless disregard for human life.'" Stover v. Commonwealth, 31 Va. App. 225, 231, 522 S.E.2d 397, 400 (1999) (quoting Jetton v. Commonwealth, 2 Va. App. 557, 561, 347 S.E.2d 141, 144 (1986)).

"An important distinction between involuntary manslaughter and lesser offenses 'is the likelihood of injury to other users of the highways.'" Hargrove v. Commonwealth, 10 Va. App. 618, 620, 394 S.E.2d 729, 731 (1990) (quoting Mayo v. Commonwealth, 218 Va. 644, 648, 238 S.E.2d 831, 833 (1977)).

> In determining the degree of negligence sufficient to support a conviction of vehicular involuntary manslaughter, the accused's conscious awareness of the risk of injury created by his conduct is necessarily a significant factor. . . . [W]hen the driver proceeds in the face of a known risk, the degree of negligence is increased, and may turn that which would have been ordinary negligence into gross, willful or wanton negligence.

Keech, 9 Va. App. at 278, 386 S.E.2d at 816. "Criminal negligence as the basis for involuntary manslaughter is judged under an objective standard and, therefore, may be found to exist where the offender either knew *or should have known* the probable results of his acts." Conrad, 31 Va. App. at 121-22, 521 S.E.2d at 325-26 (emphasis added). Therefore,

> a conviction of involuntary manslaughter involving the operation of a motor vehicle can be supported when the conduct of the driver constitutes a great departure from that of a reasonable person (gross, wanton or willful conduct) which creates a great risk of injury to others and where by the application of an objective standard the accused should have realized the risk created by his conduct.

Keech, 9 Va. App. at 280, 386 S.E.2d at 817.

This Court addressed involuntary manslaughter convictions based on the act of falling asleep while driving in Hargrove and Conrad. In Hargrove, the appellant fell asleep while driving and struck and killed a pedestrian walking across the street. Hargrove, 10 Va. App. at 619, 394 S.E.2d at 730. The appellant had worked all night and was "extremely tired" at the time of the accident. Id. at 619, 394 S.E.2d at 730-31. This Court held that the appellant's act of falling asleep while driving did not constitute criminal negligence under the circumstances of the case. Id. at 621-22, 394 S.E.2d at 731-32. This Court found that there was no evidence suggesting that the appellant should have known that he would likely fall asleep on his way home from work. Id. Although noting that the appellant was tired at the time of the accident, this Court held that the appellant "could reasonably have believed that he could negotiate his vehicle a short distance without endangering human life." Id. at 622, 394 S.E.2d at 732. This Court expressly stated, however, that

> [i]f [the appellant] *had been operating his vehicle for a number of hours in a tired and sleepy condition, or while in such a state undertook a trip of such a substantial distance or time that he should have known he might fall asleep*, the evidence might

- 8 -

support a finding that he was acting in reckless disregard for human life.

Id. at 621-22, 394 S.E.2d at 731 (emphasis added).

In contrast to Hargrove, this Court found that the evidence supported an appellant's involuntary manslaughter conviction in Conrad. Like the appellant in Hargrove, Conrad fell asleep while driving and struck and killed a pedestrian. Conrad, 31 Va. App. at 117, 521 S.E.2d at 323. Unlike the appellant in Hargrove, however, Conrad had been awake for twenty-two hours. Id. He also had "nodded off" four or five times while driving shortly before the accident. Id. at 118, 521 S.E.2d at 324. Under these facts, this Court held that Conrad should have known that his drowsiness affected his driving abilities. Id. at 124, 521 S.E.2d at 327. This Court concluded that Conrad's "decision to continue driving in such an impaired state was a callous act of indifference to the safety of others[,]" and affirmed Conrad's conviction. Id.

Although Cheung had not been awake for as long as Conrad at the time of the accident and there is no evidence in the record indicating that he "nodded off" multiple times before the crash, this case presents the exact hypothetical situation warned of in Hargrove. Cheung undertook a trip of "substantial distance [and] time" while in "a tired and sleepy condition," and had "been operating his vehicle for a number of hours" in this impaired state when the bus crashed. Hargrove, 10 Va. App. at 621-22, 394 S.E.2d at 731. At the time of the crash, the bus had been on the road for seven hours and still had at least three and a half hours of travel time left before it would reach its destination.

Moreover, and more importantly, the evidence presented in this case demonstrates that Cheung was aware that he was driving in an impaired state. Ample evidence establishes that Cheung was tired and drowsy at the time of the crash and that he was aware of his impaired condition hours before the accident. Passengers testified that Cheung appeared confused when they boarded the bus in Greensboro at the beginning of the trip. Cheung also appeared agitated

- 9 -

at the early bus stops, and was ill-tempered with several passengers. Although being confused, agitated, and ill-tempered alone may not necessarily indicate tiredness or fatigue, these behaviors are symptoms of those conditions that at least suggest that Cheung was tired early in the trip. Multiple passengers also saw Cheung buy and consume coffee and energy drinks before and after the bus left South Hill.

Regardless of the inferences implied by Cheung's behavior and his consumption of multiple energy drinks, Cheung's awareness of his impaired state is established in this case by his own admissions. One passenger sitting behind Cheung on the bus heard him tell an unknown party over the phone that he was tired and that he did not get enough rest due to his work schedule. Cheung also told the police officers investigating the accident that he felt tired before the crash.

The evidence also establishes that Cheung should have been aware that his drowsy state was adversely affecting his driving. Several passengers, one of them an experienced professional bus driver, testified that Cheung drove erratically for at least an hour before the accident. Cheung changed lanes without signaling, travelled at erratic speeds, and drove the bus in such a way that it swerved and leaned when it changed lanes. One passenger saw other vehicles pull off the highway to avoid the bus. Cheung also drove the bus across the lines marking the lanes of travel on the highway multiple times, and hit the rumble strips on the side of the highway twice before the crash. Immediately before the crash, Cheung's driving was so erratic and unsafe that a truck driver called 911. Given the difficulty that he had driving the bus during the hour before the crash, Cheung should have realized that his impaired condition was affecting his driving and posing a risk to the safety of those on the bus.

"Because it is impossible to drive safely while sleeping, and driving with one's eyes closed creates a clear potential for injury to any person in the vicinity, the deliberate failure of a

driver to heed clear warning signs of drowsiness is evidence of a reckless disregard for human life." Skidmore v. Maryland, 887 A.2d 92, 96 (Md. Ct. Spec. App. 2005). Under the circumstances of this case, Cheung should have known that his actions would likely cause great harm to others. He knew that he was tired, and he should have known that there was a risk he would fall asleep while driving. Cheung, however, chose to disregard this risk and attempted to drive a considerable length of time and distance.

Furthermore, Cheung is more culpable than the typical driver in this case due to the fact that he disregarded the risk that he would fall asleep *while driving a bus*. When driven negligently, buses present a greater risk of harm than do other vehicles. Due to their size and weight, buses are more difficult to drive than typical passenger automobiles.[3] Accordingly, bus drivers are required to undergo additional training and pass additional tests to demonstrate their competence driving these vehicles in order to obtain licenses. See Code §§ 46.2-341.7, 46.2-341.9, 46.2-341.14, and 46.2-341.16. Because of their weight, buses often inflict greater harm and cause more damage when they crash. Most importantly, however, buses are designed to transport large numbers of people. When a bus is driven negligently, this negligence threatens the safety of not only those traveling near the bus, but also the safety of the numerous passengers riding on the bus.[4]

---

[3] For example, buses take up more space on the roads and take longer to stop. They are also more difficult to maneuver, and their structure often greatly obstructs their drivers' view behind the vehicles.

[4] We note that common carriers are held to an elevated standard of care in civil cases.

> [T]he duty of care imposed on common carriers is an elevated duty that requires them "so far as human care and foresight can provide . . . to use the utmost care and diligence of very cautious persons; and they will be held liable for the slightest negligence which human care, skill and foresight could have foreseen and guarded against."

In the present case, Cheung disregarded the safety of those traveling on the highway and the fifty-seven passengers riding on the bus when he attempted to drive for an extended period of time over a long distance when he knew that he could fall asleep behind the wheel. Cheung drove the bus knowing that he was tired, and continued to do so even when it was apparent that his impaired state was negatively affecting his driving. Like the decision made by the driver in Conrad, Cheung's decision to continue driving in such an impaired state was "a callous act of indifference to the safety of others." Conrad, 31 Va. App. at 124, 521 S.E.2d at 327. The evidence presented in this case establishes that Cheung's negligence was so gross, wanton, and culpable as to show a reckless disregard of human life. Therefore, the evidence was sufficient to support Cheung's convictions, and the circuit court did not err by convicting Cheung of each count of involuntary manslaughter. Accordingly, we affirm the circuit court's decision.

Affirmed.

Taboada v. Daly Seven, Inc., 271 Va. 313, 326, 626 S.E.2d 428, 434 (2006) (quoting Norfolk & Western Ry. v. Birchfield, 105 Va. 809, 821, 54 S.E. 879, 883 (1906)). This elevated standard does not apply in criminal involuntary manslaughter cases, and therefore we do not apply that standard in this case.