COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Russell, Malveaux and Friedman
Argued at Richmond, Virginia


LESTER LOUIS LABARGE
                                                    MEMORANDUM OPINION* BY
v.        Record No. 0081-21-2                 JUDGE MARY BENNETT MALVEAUX
                                                      FEBRUARY 22, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HANOVER COUNTY
Patricia Kelly, Judge

Theodore D. Bruns (Blackburn, Conte, Schilling & Click, on brief),
for appellant.

Liam A. Curry, Assistant Attorney General (Mark R. Herring,[1]
Attorney General, on brief), for appellee.


Lester Louis Labarge ("appellant") was convicted of involuntary manslaughter, in

violation of Code § 18.2-36, and reckless driving, in violation of Code § 46.2-852.  On appeal,

appellant argues that the trial court erred in finding the evidence sufficient to convict him of each

offense.  For the following reasons, we affirm.

## I.  BACKGROUND

In accord with familiar principles of appellate review, we state the facts in the light most

favorable to the Commonwealth, the prevailing party at trial.  *Gerald v. Commonwealth*, 295 Va.

469, 472 (2018).

On the night of October 11, 2018, a motor vehicle accident occurred near Exit 38-B on

Interstate 295 South.  At approximately 9:00 p.m., Hanover County dispatchers directed Engine

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

6, Medic 6, and Rescue 10—respectively a fire engine, an ambulance, and a heavy rescue vehicle—to an accident scene.

Engine 6 crew members Christopher Elish and Carter Lewis testified that it was windy and raining heavily as the engine made its way to the accident scene. Lewis also noted that there was a "lot of water on the road." Elish heard Lieutenant Brad Clark, Engine 6's officer, instruct his driver to "take it easy" and caution him that "you don't want to lose control, just make sure we get there." Lewis estimated that Engine 6 drove to the accident scene at approximately forty miles per hour.

When Engine 6 arrived at the accident scene, the driver parked it with its front end on the shoulder by the median and its back end in the left-hand lane ("Lane 1"). Lewis and Elish testified that after Engine 6 stopped, its emergency lights remained activated and flashing. The crew dismounted, and as Elish reached for some equipment, he heard Clark say, "ya gotta be kidding me." Elish looked at Clark, who was standing in front of Engine 6 and watching to the rear, and then looked back to see a tractor-trailer "coming through the rain[,] coming for us." Elish noted that the vehicle, driven by appellant, was in the second lane from the median ("Lane 2"). The tractor-trailer struck the rear of Engine 6.

As a result of the collision, Lieutenant Clark was pinned beneath Engine 6 and died of blunt force trauma to the torso. Appellant was indicted for involuntary manslaughter and reckless driving.

At trial, Zachary Daniel testified as an expert in forensic meteorology and described the weather conditions that existed along 295 South on October 11. Daniel noted that the remnants of Hurricane Michael were moving through the area and that at 9:00 p.m., the area remained under flash flood and high wind warnings. Based upon data recorded at two sites proximate to Exit 38-B, Daniel stated his conservative opinion that about four inches of rain fell in the area

throughout October 11. He further opined that at about 9:00 p.m., the wind was blowing from the north at a sustained speed of twenty-five to thirty-five miles per hour and gusting above forty miles per hour. Daniel explained that this wind would have struck a vehicle traveling on 295 South near Exit 38-B on its left side. He further stated that under such conditions, a high-profile vehicle such as a panel truck or tractor-trailer would be susceptible to "catch[ing] the wind like a sail."

Lieutenant Colin Bunn, the driver of Medic 6, testified that while driving to the accident scene, he experienced heavy rain and high winds. Bunn further stated that he limited his speed to forty-five miles per hour to "try[] to maintain complete control of the vehicle in . . . the wind." Nevertheless, at one point, the wind was heavy enough to blow Medic 6 from Lane 1 into Lane 2. As Bunn drove with his siren and emergency lights activated, he saw a pickup truck and two tractor-trailers pass his ambulance. The tractor-trailers were in the right-hand center lane of the highway ("Lane 3"). Bunn testified that he was "concern[ed]" when the tractor-trailers passed him at a speed exceeding his own. While the tractor-trailers were passing, Bunn could see Engine 6 ahead of him. The engine was parked on the left shoulder with its rear extending into Lane 1, and its emergency lights were flashing. Bunn soon witnessed one of the tractor-trailers lose control and "hydroplane, jackknife," so that its trailer swung to the right while its tractor remained "still in line . . . to where it was heading," which was "towards the back of Engine 6." He estimated that "[m]aybe three seconds" elapsed between the moment the tractor-trailer began to slide and the moment it hit the rear of Engine 6.

Captain David Johnston, the officer for Rescue 10, testified that when Rescue 10 responded to the initial accident, the conditions were very windy and extremely rainy. Johnston stated that his emergency lights and siren were on and that as Rescue 10 exited from Interstate 95 South onto 295 South, two in-line tractor-trailers passed it to the right. Johnston recalled

commenting to Rescue 10's driver that "they must have a deadline" because he was "surprised at how fast they were traveling based on the conditions that we were seeing." As Rescue 10 approached the initial accident scene, Johnston could see Engine 6 parked with its emergency lights flashing. Johnston then "lost that visual" and did not know why until he realized that a tractor-trailer had crashed "across the roadway."

Following appellant's crash, Sergeant Matthew Jester and Trooper David Fleenor of the Virginia State Police were dispatched separately to the scene. Both men testified that the weather conditions that evening were very poor and included heavy winds and high amounts of rain, and Jester stated that the conditions were the worst he had ever experienced while on duty. Due to the weather conditions, both men reduced their speed as they drove to the accident: Jester to between thirty and thirty-five miles per hour and Fleenor to forty-five to fifty-five miles per hour. Even at this reduced speed, Jester's vehicle was blown laterally on the highway and at times he found it difficult to keep a straight course due to the wind. Fleenor described occasionally losing traction because his tires were "digging into puddles." Jester also encountered standing water and "was hydroplaning on and off."

From the crash scene, appellant was taken to the hospital where he was interviewed by Trooper D.M. Fisher of the Virginia State Police. Appellant explained to Fisher that he had been "in the right middle lane [Lane 3] going about 65 miles an hour, it was raining really hard, and the wind was pushing [him] to the left, so [he] decided to change lanes into the left middle lane [Lane 2]." When appellant changed lanes, he "hydroplaned and lost control" and struck the rear of Engine 6. Trooper Fleenor was also present during this interview. He recalled appellant stating that there had been heavy rain and wind on 295 South and that ever since driving onto 295 South the wind had been "blowing his empty trailer around." Appellant also said that when he approached the site of the accident, a crosswind struck his tractor-trailer from the right and

caused him to change lanes from Lane 3 to Lane 2. At that point, appellant's trailer hydroplaned and veered to the left towards the fire truck; when appellant "attempted to correct the veer," he struck Engine 6. Appellant stated that he had been traveling at approximately sixty to sixty-five miles per hour.

Sergeant Jester was also at the hospital and overheard a telephone conversation between appellant and appellant's son. Appellant stated that he had been in the right center lane (Lane 3) as he approached the accident scene and that he had seen emergency equipment and personnel in the left lane (Lane 1). Appellant said that when he hydroplaned, his tractor-trailer "just went where it wanted to go." Appellant stated that he had been driving about sixty miles per hour, thought there had been several inches of water on the road, and had experienced his truck being "blown around" by very strong winds. During cross-examination, Jester was questioned about his contemporaneous notes of appellant's conversation. Asked whether his notes stated, "[s]aw fire engine half in left lane, blocking left lane, was changing lanes, right center lane to left center lane, said truck just went where it wanted . . . [,]" Jester replied, "Yes, that's initially what I wrote down."

Thomas Yager testified at trial as an expert on hydroplaning. Yager had examined the crash site and appellant's trailer and opined that appellant had experienced "dynamic hydroplaning." He explained that this occurs when "a wedge of water . . . lift[s] the tire tread off of the pavement and it becomes a water ski." Under such conditions, a driver would lose steering control. Yager stated that several factors are implicated in a hydroplaning event including the weight on a vehicle's tires, because as the load on a specific tire changes "the footprint area changes." Yager opined that weight had been a factor in appellant's crash because appellant's empty trailer had made a smaller "footprint," and thus had lacked the ability to drain water from between the tires and the road "at the normal hydroplaning speed." Thus,

- 5 -

hydroplaning "would happen at a much lower speed, . . . probably more in the 30 to 40 miles per hour range." Yager also explained that changing lanes with a trailer increases the risk of hydroplaning because a trailer's length "aggravate[s] the control problem." Yager opined that appellant had a "[h]igh risk" of hydroplaning on the evening of October 11, based on the specific factors of "high speed, wind conditions up to 40 miles per hour, and the light weight on the trailer tires."

Appellant testified that he had been driving professionally for about twenty years and that on October 11 he had been driving an empty trailer from Springfield to Chester. As appellant drove south of Ashland the weather had become stormy with increasing rain and wind. Appellant stated that when he exited Interstate 95 onto 295 South, he had been driving about sixty or sixty-five miles per hour. On 295 South, it began raining harder and the wind "started kind of moving [the] trailer." Appellant described the movement as "[l]ike when a gust . . . hits the side of the trailer like a punch." He testified that at that point, he had been in Lane 3 and the wind was pushing him from the left, so he "went to the left center lane [Lane 2]." Appellant clarified that he changed lanes "[t]o try to get the wind to stop pushing on my trailer." When appellant saw Engine 6 in Lane 1, he had "tried to get back into [Lane 3], and that's when [he] hydroplaned."

During cross-examination, appellant agreed that he was an experienced truck driver who was familiar with driving hazards such as strong winds and heavy rains and that he knew he should take precautions in bad weather, including reducing speed and avoiding abrupt lane changes which could cause loss of control. Appellant also agreed that on October 11, there was a lot of rain on the highway and "[m]ost likely" standing water. Appellant acknowledged understanding that wind can create performance problems with trailers, that an empty trailer is

susceptible to greater problems, and that wind blowing on an empty trailer may cause an effect "sort of like a sail."

Appellant also acknowledged telling police that he had been driving sixty to sixty-five miles per hour in Lane 3, the wind had been pushing his trailer to the left, and he had decided to move from Lane 3 into Lane 2. Appellant denied passing an ambulance on 295 South and stated that he had been in Lane 2 for about one-half mile prior to seeing Engine 6. He testified that Engine 6's lights had been activated, he had understood that the vehicle was a fire truck, and he had seen something that was "probably" a person in reflective clothing. Appellant also acknowledged his awareness of Virginia's "move over" law.

Tim Cheek, a forensic engineer, testified as an expert witness on behalf of appellant. Cheek had inspected appellant's tractor-trailer, reviewed data from the vehicle's "black box" control module, and reviewed data that had been remotely uploaded during the tractor-trailer's operation, including information about the vehicle's location, speed, and braking. Cheek stated that the last remote speed data for appellant's tractor-trailer indicated that appellant had been driving at sixty-four miles per hour on 295 South. That data was uploaded just after 9:05 p.m., approximately four minutes before power to the vehicle was interrupted. Cheek testified that when appellant's tractor-trailer lost power, appellant was depressing his brake pedal and his speedometer indicated that he was moving at about forty-six or forty-seven miles per hour. Cheek opined that at the time of appellant's collision with Engine 6, he was still traveling at an average speed of between forty-six and fifty-seven miles per hour. However, on cross-examination, Cheek agreed that because his speed calculations were based upon determining an average speed over several miles' distance, he could not exclude the possibility that appellant was driving faster than forty-five to fifty-seven miles per hour at the time of the

collision. Further, Cheek agreed that appellant's speedometer only indicated his speed at impact and not his speed in the moments before he collided with Engine 6.

The trial court convicted appellant of involuntary manslaughter and reckless driving. This appeal followed.

## II. ANALYSIS

"When considering the sufficiency of the evidence, an appellate court views the evidence 'in the light most favorable to the Commonwealth, the prevailing party below.'" *Williams v. Commonwealth*, 71 Va. App. 462, 483 (2020) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)). "This Court must 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence].'" *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)). "Considering the evidence from that vantage point, '[a]n appellate court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Commonwealth v. Cady*, 300 Va. 325, ___ (2021) (alteration in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "It asks instead 'whether *any* rational trier of fact could have found the essential elements of the crime' under the applicable standard." *Bagley*, 73 Va. App. at 26 (quoting *Davis v. Commonwealth*, 65 Va. App. 485, 500 (2015)). Thus, "[i]f there is evidentiary support for the conviction, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." *Blackwell v. Commonwealth*, 73 Va. App. 30, 54 (2021) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). Accordingly, this Court will "affirm the trial court's judgment 'unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.'" *Poole v. Commonwealth*, 73

Va. App. 357, 363 (2021) (quoting *Alvarez Saucedo v. Commonwealth*, 71 Va. App. 31, 47 (2019)).

A sufficiency inquiry "does not distinguish between direct and circumstantial evidence, as the fact finder itself is entitled to consider all of the evidence, without distinction, in reaching its determination." *Bagley*, 73 Va. App. at 26-27 (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)). "Similarly, the appellate court's review of the record generally 'is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling.' Appellate review requires a 'totality-of-the-evidence analysis,' . . . rather than a 'fragmented assessment of the record.'" *Mollenhauer v. Commonwealth*, 73 Va. App. 318, 334 (2021) (first quoting *Bolden v. Commonwealth*, 275 Va. 144, 147 (2008); then quoting *Moseley*, 293 Va. at 464). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Pick v. Commonwealth*, 72 Va. App. 651, 668 (2021) (quoting *Finney v. Commonwealth*, 277 Va. 83, 89 (2009)).

## A.  Involuntary Manslaughter

Appellant argues that the trial court erred in finding the evidence sufficient to convict him of involuntary manslaughter. He contends that he was driving below the posted speed limit when he hydroplaned and collided with Engine 6 and that he made normal lane changes, first to mitigate crosswinds and then to give space to Engine 6 when he realized it was blocking Lane 1. Accordingly, appellant argues, there was insufficient evidence to convict him of involuntary manslaughter because nothing about appellant's conduct suggests that he acted with a reckless disregard for human life.

"The Supreme Court has defined 'the common law crime of involuntary manslaughter as the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some

unlawful, but not felonious, act; or in the improper performance of a lawful act.'" *Brown v. Commonwealth*, 68 Va. App. 44, 51 (2017) (quoting *Noakes v. Commonwealth*, 280 Va. 338, 345 (2010)). More specifically, "[i]n cases involving the operation of a motor vehicle, we generally have defined involuntary manslaughter as an accidental killing that is proximately caused by criminal negligence involving conduct 'so gross, wanton, and culpable as to show a reckless disregard of human life.'" *Brown v. Commonwealth*, 278 Va. 523, 528 (2009) (quoting *Greenway v. Commonwealth*, 254 Va. 147, 154 (1997)). Conduct rises to the level of criminal negligence when

> acts of a wanton or willful character, committed or omitted, show "a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his acts."

*Id.* at 528-29 (quoting *Riley v. Commonwealth*, 277 Va. 467, 484 (2009)). Thus, criminal negligence "must be something more than mere inadvertence or misadventure. It is a recklessness or indifference incompatible with a proper regard for human life." *Banks v. Commonwealth*, 41 Va. App. 539, 546 (2003) (quoting *Bell v. Commonwealth*, 170 Va. 597, 611 (1938)). "Criminal negligence is judged according to an objective standard," *Brown*, 278 Va. at 528, "and the requisite mens rea 'may be found to exist when the defendant either knew or should have known the probable results of his acts,'" *Cady*, 300 Va. at ___ (quoting *Noakes*, 280 Va. at 346).

"Determining 'the degree of the hazard posed' by [a] defendant's driving . . . heavily 'depends upon the circumstances in each case.'" *Id.* (quoting *Mayo v. Commonwealth*, 218 Va. 644, 648 (1977)). "[T]he cumulative effect of a series of connected, or independent negligent acts causing a death may be considered in determining if a defendant has exhibited a reckless disregard for human life." *Cheung v. Commonwealth*, 63 Va. App. 1, 9 (2014) (quoting *Stover v.*

- 10 -

*Commonwealth*, 31 Va. App. 225, 231 (1999)). "Generally, negligence . . . [is a] factual finding[]," and thus an issue for a trier of fact to resolve; it only becomes a question of law "'when reasonable minds could not differ.'" *Levenson v. Commonwealth*, 68 Va. App. 255, 258 (2017) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 655 (2015)). Such factual findings "are not to be disturbed unless they are plainly wrong or are without evidence to support them." *Id.* at 259 (quoting *Wilkins v. Commonwealth*, 292 Va. 2, 7 (2016)).

We hold, contrary to appellant's argument, that sufficient evidence supports the finding that appellant operated his tractor-trailer with a reckless or indifferent disregard of the rights of others under circumstances which made it not improbable that others would be injured. The evidence established that weather conditions along 295 South on the night of October 11, 2018 were bad. A flash flood warning was in effect around Exit 38-B after several inches of rain had fallen, and a high wind warning was also in effect with winds of twenty-five to thirty-five miles per hour and gusts over forty miles per hour blowing from the left side of the highway. Emergency responders from the Virginia State Police, Engine 6, Medic 6, and Rescue 10 testified that they experienced very bad weather conditions that evening. Appellant himself acknowledged how bad the weather was, telling police that there had been heavy rain and wind on 295 South and testifying to the same at trial.

This bad weather negatively affected driving conditions near Exit 38-B. Engine 6's driver was instructed to "take it easy" so that he would not lose control under the conditions, and he limited his speed in responding to an emergency to about forty miles per hour. Medic 6 was pushed from Lane 1 into Lane 2 by high winds from the left, and its driver, Lieutenant Bunn, limited his speed to approximately forty-five miles per hour to maintain control of the vehicle. Sergeant Jester could feel his vehicle being blown from left to right across the highway, and he hydroplaned off and on when responding to appellant's collision. Similarly, Trooper Fleenor

testified to his difficulty maintaining traction due to "puddles" on the road. Thomas Yager testified that appellant was at a high risk of hydroplaning on the evening of October 11, in part because of high winds. His testimony also established that in the presence of much water on the highway, hydroplaning could occur at lower than usual speeds.

Appellant himself was aware of the negative effects of the poor weather upon driving conditions that evening. He told Troopers Fleenor and Fisher that on 295 South, the wind was blowing his empty trailer around and pushing on his tractor-trailer. Sergeant Jester overheard appellant tell his son that his truck was being blown around and that there was a large amount of water on the road. In his own testimony, appellant acknowledged that while he was driving on 295 South, the wind was moving his trailer as if it were being "punch[ed]."

More generally, appellant's testimony established that he was an experienced truck driver who was familiar with the hazards of driving in strong winds and heavy rain and that he knew that in poor weather he should take precautions such as reducing speed and avoiding abrupt lane changes that might cause him to lose control of his vehicle. Appellant acknowledged his understanding that wind can create performance problems with trailers, that empty trailers are more susceptible to such problems, and that wind blowing on an empty trailer can cause an effect like that of wind on a sail.

Despite appellant's cognizance of the very poor weather and its effects upon driving conditions, and his awareness of steps he should take to mitigate driving hazards that might cause loss of control, appellant followed none of these precautionary measures. Instead, he made a series of unsafe decisions within a short time frame while knowingly encountering very poor driving conditions.

First, appellant passed two emergency vehicles that had their lights and sirens activated. Code § 46.2-829 makes it a violation to pass such an emergency vehicle, and the presence of two

first responder vehicles with lights and sirens activated was a signal to slow down because there was likely first responder activity in the area. Instead, appellant rushed past the responder vehicles and then moved from Lane 3 to Lane 2. In doing so, appellant moved *closer* to Engine 6 which was visibly parked on the side of the roadway and in Lane 1, as its crew worked at an accident scene. Appellant's presence in Lane 2, adjacent to Engine 6 in Lane 1, violated Virginia's "move over" law which, again, is specifically designed to protect first responders in these precise circumstances. *See* Code § 46.2-861.1(A) (providing that when a driver approaches a vehicle that displays flashing emergency lights and is stationary along a multi-lane highway, the driver is required to "change into a lane not adjacent to the stationary vehicle").[2] Throughout these maneuvers, according to his statements to police, appellant maintained a speed between sixty and sixty-five miles per hour in terrible weather conditions.[3] The record shows there was substantial water on the roadway and that driving was hampered by high winds and poor

---

[2] At the time of appellant's offense, Virginia's "move over" law was set forth in Code § 46.2-921.1. In 2019, the General Assembly repealed that code section and added Code § 46.2-861.1. *See* 2019 Va. Acts ch. 850. The language of the two code sections is identical except for Code § 46.2-861.1's inclusion of a new statutory reference and elevation of the offense from a moving violation to reckless driving.

[3] Although not briefed by appellant, appellant's counsel suggested at oral argument that *Forbes v. Commonwealth*, 27 Va. App. 304 (1998), would preclude a trier of fact from disregarding Cheek's testimony that at the time of the collision, appellant was traveling at between forty-six and fifty-seven miles per hour. However, the language of *Forbes* relied upon by appellant is inapposite here. *See id.* at 312 ("The trier of fact must determine the weight of the testimony and the credibility of the witnesses, but it 'may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with facts in the record.'" (quoting *Williams v. Commonwealth*, 14 Va. App. 666, 669-70 (1992))). In the instant case, Cheek's testimony about appellant's speed at the time of the collision was not uncontradicted, because appellant himself stated to police and his son that he was traveling at approximately sixty to sixty-five miles per hour. Nor was Cheek's testimony about speed unambiguous. As appellant's counsel acknowledged during argument, Cheek's speed estimate was based upon averages calculated over several miles' distance. Thus, when asked whether Cheek "couldn't say what the speed was before" the moment of impact, counsel for appellant responded, "No, you're right." Further, even assuming *arguendo* that a rational trier of fact was to credit Cheek's speed calculation, that trier of fact could still conclude that appellant's speed was too fast for conditions.

visibility as the remnants of a tropical storm moved through the area. From this record, a rational trier of fact could infer that even if appellant was driving below the posted speed limit at the time of his collision with Engine 6, he was nonetheless driving too fast for the existing conditions.[4] *See* Code § 46.2-861 ("A person shall be guilty of reckless driving who exceeds a reasonable speed under the circumstances and traffic conditions existing at the time, regardless of any posted speed limit.").

Appellant contends that, despite his multiple errors in judgment, his conduct does not exhibit the type of "outlier" or egregious misconduct generally required to establish involuntary manslaughter. In support of this proposition, he argues there is no evidence that he was impaired, intoxicated, distracted, texting, or driving erratically. Our case law confirms that the standard required to prove involuntary manslaughter is a high one. *Conrad v. Commonwealth*, 31 Va. App. 113, 121 (1999); *Tubman v. Commonwealth*, 3 Va. App. 267, 271 (1986); *see also Harris v. Harman*, 253 Va. 336, 341 (1997).

However, "[T]he cumulative effect of a series of connected, or independent negligent acts causing a death may be considered in determining whether a defendant has exhibited a reckless disregard for human life." *Cheung*, 63 Va. App. at 9 (quoting *Stover*, 31 Va. App. at 231). Here we must weigh the cumulative effect of appellant's decisions to (1) rush past two emergency vehicles with their lights and sirens engaged, (2) move *closer* to Engine 6 and into the lane

---

[4] In discussing the reasonable inferences to be drawn from the evidence of the weather, the driving conditions, and appellant's speed, counsel for appellant acknowledged at oral argument that "I think that you could certainly conclude, if you wished, that [appellant's speed] was too fast for conditions." At a later point, counsel for appellant contended that the fact that a pickup truck and another tractor-trailer were driving at similar speeds to appellant's suggested that appellant was "not an outlier" in his conduct. However, when asked whether he was arguing that "because [an accident] didn't happen to the other vehicles, that that makes [appellant's conduct] outside the realm of being willful and wanton," counsel for appellant clarified that he was "not suggesting that the fact that the other vehicles didn't have the same result . . . has any bearing on [appellant's] decision-making."

adjacent to it while its lights were activated at an accident scene, in violation of the "move over" law, and (3) drive at excessive speeds while knowing conditions were treacherous and that his empty trailer was being "blown around." In undertaking this analysis, we are satisfied that the evidence supports the trial court's finding that appellant operated his tractor-trailer with the requisite *mens rea* to convict him of involuntary manslaughter—that is, that appellant's series of risky maneuvers, under the conditions present on October 11, 2018, demonstrated a reckless, indifferent disregard for Engine 6's crew under circumstances which made it not unlikely that injury would occur and that appellant knew or should have known the probable consequences of his acts and omissions.[5] *See Brown*, 278 Va. at 528-29. Because the trial court's finding with respect to criminal negligence was neither plainly wrong nor without evidence to support it, we cannot disturb that finding.

## B. Reckless Driving

Appellant also argues that the trial court erred in finding the evidence sufficient to convict him of reckless driving. He contends that there was no evidence that he was tired, distracted, impaired, or driving erratically. Appellant also contends that his speed was below the posted speed limit and that although he changed lanes, there was no evidence that his lane change was abrupt, unreasonable, or irresponsible. Accordingly, appellant maintains that there was insufficient evidence to prove that he operated his tractor-trailer with an indifference incompatible with a proper regard for human life.

Code § 46.2-852 provides that "[i]rrespective of the maximum speeds permitted by law, any person who drives a vehicle on any highway recklessly or at a speed or in a manner so as to

---

[5] In reaching this conclusion we do not accept the Commonwealth's suggestion that appellant's conviction can be upheld simply because, as an experienced truck driver, he "should have known" he had an increased likelihood of hydroplaning in these weather conditions and his lack of care caused this accident. The standard for proving involuntary manslaughter is significantly higher than for establishing simple negligence. *Conrad*, 31 Va. App. at 121.

endanger the life, limb, or property of any person shall be guilty of reckless driving." "The essence of the offen[s]e of reckless driving lies not in the act of operating a vehicle, but in the manner and circumstances of its operation." *Blevins v. Commonwealth*, 63 Va. App. 628, 635 (2014) (quoting *Powers v. Commonwealth*, 211 Va. 386, 388 (1970)). "Criminal recklessness, the requisite mens rea specified in Code § 46.2-852 for a misdemeanor reckless-driving conviction, requires a reckless 'disregard by the driver of a motor vehicle for the consequences of his act and an indifference to the safety of life, limb, or property' of others." *Cady*, 300 Va. at ___ (quoting *Powers*, 211 Va. at 388). While "[t]his requirement is more than simple negligence, as that concept is used in civil tort cases, . . . it is less than 'gross, wanton, and culpable' negligence, the mens rea requirement for felony involuntary manslaughter."[6] *Id.* at ___ (quoting *Noakes*, 280 Va. at 345-46). In determining whether conduct rises to the level of criminal recklessness, an objective standard applies, and criminal recklessness "may be found to exist when the defendant either knew or should have known the probable results of his acts." *Id.* (quoting *Noakes*, 280 Va. at 346).

"[T]he degree of the hazard posed by a speeding [motor vehicle] depends upon the circumstances in each case." *Greenway*, 254 Va. at 155 (quoting *Mayo*, 218 Va. at 648). "Factors tending to show recklessness include erratic driving, 'the likelihood of injury to other users of the highways,' lack of control of the vehicle, driving in excess of the speed limit, 'dangerous driving behavior,' intoxication, and noncompliance with traffic markers." *Blevins*, 63 Va. App. at 635 (first quoting *Mayo*, 218 Va. at 648; then quoting *Crest v. Commonwealth*, 40

---

[6] Thus, despite the "subtle differences" between the *mens rea* standards for reckless driving and involuntary manslaughter in the operation of a motor vehicle, which are "primarily . . . differences in degree," the two offenses are distinct. *Cady*, 300 Va. at ___. *See also Delawder v. Commonwealth*, 214 Va. 55, 58 (1973) (holding that the defendant was not entitled to a jury instruction on reckless driving as a lesser-included offense of involuntary manslaughter because "although arising out of the same occurrence," the two offenses were separate and distinct).

Va. App. 165, 172 (2003)). However, "[t]he mere happening of an accident does not give rise to an inference of reckless driving." *Crest*, 40 Va. App. at 174 (quoting *Powers*, 211 Va. at 388). A series of independent or connected negligent acts causing a death, when evaluated cumulatively, may be considered in determining whether the defendant exhibited a reckless disregard for human life. *Cheung*, 63 Va. App. at 9.

We hold, contrary to appellant's argument, that sufficient evidence supports appellant's conviction for reckless driving. We reach this conclusion because a rational trier of fact, evaluating the same evidence the trial court considered in convicting appellant of involuntary manslaughter, could have employed that evidence differently to find that the distinct *mens rea* required to convict for reckless driving had also been satisfied. Such a trier of fact could have concluded that appellant's speed alone constituted reckless driving under the circumstances that existed on the night of October 11, 2018. *See* Code § 46.2-861 ("A person shall be guilty of reckless driving who exceeds a reasonable speed under the circumstances and traffic conditions existing at the time, regardless of any posted speed limit."). Alternatively, a trier of fact could have concluded that appellant's conduct in passing Medic 6 and Rescue 6 constituted reckless driving. *See* Code § 46.2-829 (providing, in pertinent part, that overtaking or passing a moving emergency vehicle while it displays activated warning lights and gives an audible signal constitutes reckless driving). In addition, a rational trier of fact could have relied upon other evidence that supported appellant's conviction for involuntary manslaughter, including appellant's lane change near Engine 6 under adverse driving conditions and his knowledge of the risks of hydroplaning, to conclude that appellant acted with the requisite *mens rea*—that is, that appellant knew or should have known that his acts and omissions created a substantial risk of harm to others and that he displayed a reckless disregard for the consequences of his conduct and an indifference to the safety of others. Because a rational trier of fact could have found from the

evidence in this case that appellant acted with the necessary degree of recklessness to convict him of reckless driving, we will not disturb the trial court's ruling. Accordingly, we hold that the trial court did not err in finding the evidence sufficient to convict appellant of reckless driving.

### III. CONCLUSION

For the foregoing reasons, we hold that the trial court did not err in finding the evidence sufficient to convict appellant of involuntary manslaughter and reckless driving and affirm the trial court's judgment.

*Affirmed.*